**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **UNITED STATES OF AMERICA**  ) | |
| ) | |
| **v.**    ) | **CRIMINAL NO. 04-10385-MEL** |
| ) | |
| **JEROME WEEKS**   ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION**
**TO SUPPRESS**

The United States, by and through United States Attorney

Michael J. Sullivan and Assistant United States Attorney William

H. Connolly, hereby submits this memorandum in opposition to

Defendant Jerome Weeks' Motion To Suppress.

**FACTS**[1]

On October 23, 2004, Brockton Police Officer Mike Darrah was

working a paid detail at a bar in Brockton.  At approximately

1:00 a.m., Officer Darrah observed two males being rude to the

staff at the bar.  Darrah asked the two males to leave the bar

and they complied.  Approximately 15 minutes later Officer Darrah

observed that the two males had returned to the bar.  Officer

Darrah again asked them to leave the bar and not return.  As the

men exited the bar, Officer Darrah observed them in a verbal

confrontation with another male who was wearing a Red Sox shirt

Officer Darrah then approached all three males and told them to

---

[1]     The facts were gleaned from a relevant Brockton Police
report and grand jury testimony.

leave.  Concerned that a fight might ensue, Officer Darrah followed the three males as they exited into the parking lot.  In the parking lot the three males continued to argue and Officer Darrah again told them to leave.  In response, the parties separated and began to walk away.  The male in the Red Sox jersey got into an SUV that had pulled up along the entrance to the parking lot on Crescent Street.  At the same time, the two males looped around a fence that separates the parking lot and an adjacent building and began to walk in the direction of Crescent Street.  At this point, believing that the altercation was over, Officer Darrah turned and headed back into the bar.  Almost immediately upon turning around, Officer Darrah heard a gunshot. As he turned around he heard two more gunshots and could see the muzzle flash from both shots coming from the exact area where he had seen the two males walking.  From Officer Darrah's position, it was apparent that one of the two males was firing in the direction of the SUV as it drove down Crescent Street.  Officer Darrah immediately gave chase.  When the pursuit began, Officer Darrah and the two males were running in the same direction toward Crescent Street, but on opposite sides of the fence. Officer Darrah and the males reached Crescent Street simultaneously, but the two males were about 15 feet further down the street.  As the two males made their turn onto Crescent Street, they looked in Officer Darrah's direction.  Officer

Darrah got a good enough look to confirm that they were the same two males.  Within 15-20 seconds of giving chase, Officer Darrah caught up to the two males as they tried to scale a very narrow (about 2-3 feet wide) section of fence that connects the back corner of a Verizon building to a seven-foot high barbed wire fence that runs along the Verizon parking lot.  One male, later identified as Weeks, was able to successfully scale the fence, but Officer Darrah was able to grab the other suspect as he began to climb the fence.  Because the section of fence was so narrow, the second suspect had to wait until Weeks got to the top before he began to climb (The other option was to try to climb over the barbed wire fence).  As Officer Darrah was wrestling the other suspect to the ground, he heard Weeks fall to the ground and then get up an begin running.  As Officer Darrah placed the other suspect under arrest, he radioed to responding units and provided a description of Weeks as well as his direction of escape.  Immediately upon hearing Officer Darrah's transmission, a responding officer observed a male walking quickly from a vacant lot adjacent to the Verizon building.  As the officer approached, the male claimed that he was running from a gun fight.  The male was then returned to Officer Darrah's location and Officer Darrah identified him as the second suspect.  This suspect was identified as Jerome Weeks.  Officer Darrah recognized Weeks' face and also recognized a distinctive leather Averex jacket that

Weeks was wearing.  After securing the two suspects, officers
conducted a line search beginning at the location where Weeks was
apprehended.  Tracing back Weeks' suspected line of travel the
officers came upon a gun and a Nextel cell phone located at a
corner of the Verizon building, on the opposite side of the fence
from where Officer Darrah apprehended the other suspect.  Back at
the station, one of the officers dialed the phone number that was
listed on the cell phone.  The voice mail message stated, "You
have reached Jerome at Nice Car Autos."  In addition, during
processing Weeks was found to have a Nextel cell phone holder
clipped to his belt.

Back at the scene of the shooting, officers located two of
the three shell casings.  The State Police Ballistics Unit
matched those casings to the gun that was recovered.


**ARGUMENT**

The defendant seeks to suppress from use in evidence the
cell phone abandoned by Weeks. (Defendant's Motion to Suppress).
The defendant contends that the cell phone was unlawfully seized,
and is therefore inadmissible at trial.  This argument fails
because Weeks abandoned the cell phone and therefore its seizure
did violate the Fourth Amendment.  Even assuming that the cell
phone was not abandoned, it was lawfully seized pursuant to the
plain view exception to the exclusionary rule.  Finally, even if

4

Officer Darrah pulled the cell phone from Weeks during the pursuit, the cell phone would be admissible because it would have been inevitably discovered during a search incident to arrest or a custodial inventory of the defendant.

### 1. **Abandonment**

As a preliminary matter, the government notes that the defendant was not seized prior to his abandonment of the gun. The issue of the when the seizure occurred in this case is governed by the Supreme Court's analysis in California v. Hodari D., 499 U.S. 621 (1991). In Hodari D., the Supreme Court held that a seizure does not occur until an individual yields to police authority. California v. Hodari D., 499 U.S. at 626. The Hodari D. Court explained,

> The language of the Fourth Amendment, of course, cannot sustain [Hodari D's] contention. The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. ("She seized the purse-snatcher, but he broke out of her grasp.") It does not remotely apply, however, to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee. That is no seizure.

The Court concluded:

> In sum, assuming that [the officer's] pursuit in the present case constituted a "show of authority" enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled.

Id. at 626-629 (citations omitted).

Applying this standard to the instant case compels the

5

conclusion that there was no seizure prior to the defendant's
flight, and therefore the abandonment of the gun occurred prior
to any seizure.

It is well settled that "'[w]hen a defendant abandons
property before a "seizure" occurs, the Fourth Amendment is not
implicated because the property is not the fruit of an illegal
search and seizure.'" United States v. Lewis, 40 F.3d 1325, 1334
(1st Cir. 1994)(affirming the seizure of a handgun and of a vial
of crack cocaine which the defendants had placed under a car in a
parking lot as they saw an unmarked police vehicle approach
them), quoting from California v. Hodari D., 499 U.S. 621, 629
(1991).  Since a warrantless search or seizure of abandoned
property is not a violation of the Fourth Amendment, Abel v.
United States, 362 U.S. 217, 241 (1959), Weeks' motion to
suppress the cell phone must be denied.

   2.   **Plain View**

It is equally well settled that "[t]he seizure of property
in plain view involves no invasion of privacy and is
presumptively reasonable, assuming there is probable cause to
associate the property with criminal activity."  Payton v. New
York, 445 U.S. 573, 587 (1980).  The First Circuit Court of
Appeals has applied the "plain view doctrine" to permit the
warrantless seizure of an object if "'(1) the seizing officer has
a prior justification for being in a position to see the item in

plain view and (2) the evidentiary value of the item is immediately apparent,'" United States v. Perrotta, 289 F.3d 155, 167 (1st Cir. 2002), quoting from   United States v. Owens, 167 F.3d 739, 746 (1st Cir. 1999).

As the Supreme Court has frequently remarked, "probable cause is a flexible, common-sense standard.  It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' . . . that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand that any showing that such a belief be correct or more likely true than false.  A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required. . . . '[T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.'" Texas v. Brown, 460 U.S. 730, 742 (1983) (citations omitted).

In the instant case, the cell phone was of obvious evidentiary significance to the officers because it was found laying next to the firearm, and therefore was likely owned by the possessor of the firearm.  Thus, like a wallet or some form of identification, the cell phone likely contained, and in fact did contain, information that identified the owner.  Hence, the seizure of the cell phone was permissible under the plain view doctrine.

### 3.    __Inevitable Discovery__

Even were the Court to accept the defendant's assertion that Officer Darrah pulled the cell phone from Weeks as he scaled the fence, the cell phone would be admissible under the inevitable discovery doctrine.  Under the inevitable discovery doctrine, a court may admit illegally obtained evidence if the evidence inevitably would have been discovered through independent, lawful means.  In <u>Nix v. Williams</u>, 467 U.S. 431 (1984), the Supreme Court held admissible evidence concerning the location of a victim's body even though the police had obtained this information in violation of the defendant's sixth amendment right to counsel.  At the time, law enforcement officers were conducting an extensive search around the area where the body was eventually located.  The Court refused, on the basis of the inevitable discovery doctrine, to exclude the body as "fruit from the poisonous tree."  467 U.S. at 447.  <u>See</u> <u>also</u> <u>United States v. Lombard</u>, 853 F. Supp. 543, 546 (D.Me. 1993) (doctrine of inevitable discovery applied to murder victims' bodies when defendant revealed their location under interrogation, because the search was already underway).

In <u>United States v. Silvestri</u>, 787 F.2d 736, 744 (1st Cir. 1986), <u>cert</u>. <u>denied</u>, 487 U.S. 123 (1988), the First Circuit established the analytical framework for the inevitable discovery rule:

> [T]here are three basic concerns which surface in an
> inevitable discovery analysis: are the legal means truly
> independent; are both the use of the legal means and the
> discovery by that means truly inevitable; and does the
> application of the inevitable discovery exception either
> provide an incentive for police misconduct or significantly
> weaken fourth amendment protection?

The government must prove inevitability by a preponderance of the

evidence.  <u>Nix</u>, 467 U.S. at 444.

In this case, the three requirements of the inevitable

discovery doctrine have been established.  First, there were

legal means of searching for the item at issue that were truly

independent of the officer's alleged misconduct in the seizure of

the cell phone because Weeks would have been, and in fact was,

searched incident to arrest and as a part of a routine Brockton

Police Department inventory search.  Second, it cannot be

seriously disputed that the Brockton officers would have found

the cell phone on Weeks during their search of him.  Finally, the

discovery of the cell phone was truly inevitable because, even

accepting the defendant's version of events, it was located in an

area--on his person--that was ultimately searched.  <u>See</u> <u>United</u>

<u>States v. Jones</u>, 149 F.3d 715, 716-717 (7th Cir. 1998) (observing

that "[i]t is hard to understand how the discovery of evidence

inside a house could be anything but 'inevitable' once the police

arrive with a warrant").  An opposite result would be impossible

to square with <u>Nix</u> and with decisions of the First Circuit that

have applied the rule even where discovery of the evidence was

far less inevitable.   See, e.g., United States v. Procopio, 88
F.3d 21, 27 (1st Cir. 1996) (search of locked briefcase
inevitable where police knew defendant was subject of bank
robbery investigation: police would have contacted federal agent
concerning briefcase even had they not opened it and seen
evidence, and federal agent would have applied for warrant to
search briefcase); Ford, 22 F.3d at 377-381 (applying inevitable
discovery rule despite warrantless search of house because, in
absence of illegal search, agents inevitably would have applied
for and received warrant based on untainted information
establishing probable cause); United States v. Zapata, 18 F.3d
971, 978-979 n.7 (1st Cir. 1994) (applying inevitable discovery
rule even assuming car search illegal, because car unregistered
and uninsured and therefore "surely would have been impounded" in
future and police would have conducted lawful inventory search
after impound and discovered evidence); United States v.
Silvestri, 787 F.2d 736, 740-741 (1st Cir. 1986) (applying
inevitable discovery rule where initial warrantless search of
house revealed key evidence).

## CONCLUSION

    For the foregoing reasons, the defendant's Motion to
Suppress must be denied.

                            Respectfully submitted,

                            Michael J. Sullivan
                            United States Attorney


                    By:    /s/ William H. Connolly
                            William H. Connolly
                            Assistant U.S. Attorney


May 17, 2005