UNITED STATES OF AMERICA
DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 2004-10385-MEL

UNITED STATES OF AMERICA

v.

JEROME WEEKES

MEMORANDUM IN SUPPORT OF
MOTION TO SUPPRESS SEARCH AND SEIZURE -- CELL PHONE

Now comes the defendant and files this memorandum in support of his motion to suppress the seizure of the defendant's cell phone by the Brockton Police on October 23, 2004.

The defendant contends that the seizure of his phone violated his rights pursuant to the Fourth Amendment to the United States Constitution.  The defendant has not moved to suppress the gun which was found near his phone because the gun must have been picked up by Brown and either discarded by him or seized from him by Darrah when Darrah was able to wrestle Brown off the fence.

**Facts:**

On October 23, 2004, the defendant was chased by a Brockton Massachusetts police officer.  Prior to being chased by the police officer the defendant had not committed any crime nor had he committed any act which would have warranted the police to stop, or question the defendant.  Without reasonable suspicion nor probable cause the Brockton police officer ordered the

defendant and Kelvin Brown to stop. They elected not to stop and the police officer started to chase after them. They ran down a street into a parking lot and up to a chain link fence. Once at the fence the police officer grabbed at the defendant and Brown. The defendant scaled the fence while Brown was wrestled to the ground. While the defendant was climbing the fence, the police officer knocked the defendant's cell phone from the defendant's person to the ground. After scaling the fence, the defendant fled from the police officer into a field.

Subsequently, the police retrieved the cell phone and now intend to introduce the cell phone into evidence during the defendant's trial. The police contend that the cell phone connects the defendant to a firearm which also was seized by the police near the fence the defendant was climbing on October 23, 2004.

**Argument:**

The police officer's conduct of chasing the defendant and seizing him and his cell phone while he was climbing the fence was improper because it was not founded upon probable cause or reasonable suspicion.

In justifying an investigation or particular intrusion upon the constitutionally protected interests of a private citizen, an officer must be able to attest to "specific and articulable facts which, taken together with rational inferences from those

facts, reasonably warrant that intrusion." Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868 (1968) and United States v. Golab, 325 F.3d 63 (1st Cir. 2003). While reasonable suspicion is a less demanding standard than probable cause, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581 (1989). The officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. Terry, 392 U.S. at 27, 88 S.Ct. 1868. In reviewing a determination of reasonable suspicion, we examine the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744 (2002).

    A seizure requires "either physical force...or, where that is absent, submission to the assertion of authority." California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547. A police order to stop does not give rise to a stop unless the person to whom the order is directed submits to the order or is physically apprehended. Hodari D., 499 U.S. at 626, 111 S.Ct. 1547. A police pursuit in attempting to seize a person does not amount to a seizure within the meaning of the Fourth Amendment. County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708 (1998).

    A police officer should not be empowered to order someone

to stop unless the officer reasonably suspects the person of being engaged in illegal activity. United States v. Swindle, 407 F.3d 562, 567-568 (2d Cir.2005). This position is faithful to Terry's own prescription that, when stopping a suspect, a police "officer's action [be] justified at its inception." Terry, 392 U.S. at 20, 88 S.Ct. 1868. The settled requirement is, of course, that reasonable suspicion must arise before a search or seizure is actually effected. As the Supreme Court has held, the "reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." Florida v. J.L., 529 U.S. 266, 271, 120 S.Ct. 1375 (2000); see also United States v. Como, 340 F.2d 891, 893 (2d Cir.1965) ("[I]t is an elementary maxim that a search, seizure or arrest cannot be retroactively justified by what is uncovered."). The rule is therefore clear that an illegal stop cannot be made legal by incriminating behavior that comes after the suspect is stopped.

   Numerous federal appellate courts have emphasized that a stop must be justified at its inception. See Feathers v. Aey, 319 F.3d 843, 848-49 (6th Cir.2003) ("The question is whether, at the moment that they initiated the stop, the totality of the circumstances provided the officers with the reasonable suspicion required in order to detain a citizen under Terry."); United States v. Finke, 85 F.3d 1275, 1279 (7th Cir.1996)

("Under Terry the stop must be justified at its inception...."); United States v. Crain, 33 F.3d 480, 485 (5th Cir.1994) ("[T]he issue of whether an investigatory detention or traffic stop complies with the Fourth Amendment depends [in part] upon...whether the stop was justified at its inception."); United States v. Walker, 933 F.2d 812, 815 (10th Cir.1991) (noting that, to uphold a Terry stop, a court must determine "whether the officer's action was justified at its inception").

However, current Fourth Amendment jurisprudence suggests that seizure of items discarded after an unreasonable order to stop does not violate the Fourth Amendment. See Hodari D., 499 U.S. at 629, 111 S.Ct. 1547. The Hodari D. Court made two critical observations. First, it accepted as true for purposes of its decision that the police pursuit qualified as a show of authority calling upon Hodari to halt. Id. at 625-26, 111 S.Ct. 1547 (internal quotation marks omitted). Second, the Court relied upon the State's concession that the police, at the moment they gave chase, did not have the reasonable suspicion required to justify stopping Hodari. Id. at 623 n. 1, 111 S.Ct. 1547. Taken together, these two observations show that the Court reached its holding even while assuming for the sake of argument that the police had issued an unreasonable order to stop. The Court concluded that since Hodari did not comply with the order, he was not seized until he was tackled. The cocaine

abandoned while Hodari was running was not the fruit of a seizure, and his motion to exclude evidence of it was properly denied.  Id. at 629, 111 S.Ct. 1547.

In the instant case, the defendant did not abandoned the cell phone while being chased by the police officer.  Cf. Abel v. United States, 362 U.S. 217, 241 (1960) (if a defendant abandons property while he is being pursued by police officers, he forfeits any reasonable expectation of privacy he may have had in that property), i.e. United States v. Moroney, 220 F.Supp. 2d 52 (D.Mass. 2002)(defendant abandoned fanny pack in McDonald's restroom).  On the contrary, the police stripped the phone from the defendant or it fell from the defendant during the illegal use of physical force on the defendant which was not premised on reasonable suspicion or probable cause.  The seizure of the cell phone should be suppressed as a fruit of an illegal stop.  Hodari D., at 629; United States v. Lewis, 40 F.3d 1325, 1334 (1st Cir. 1994).

During the motion to suppress hearing, Brockton Patrolman Michael Darrah testified that on October 23, 2004, he was working a paid detail at a bar called Joe Angelo's Café.  The bar paid the City and the City supplied a police officer to provide security.  That evening Officer Darrah had several discussions with defendant and the defendant's companion, Kelvin Brown.  Weekes and Brown were once asked to leave, but later

allowed back in by the bar owner's wife.

Finally, at about closing time, Weekes and Brown were arguing with a man wearing a Red Sox shirt. Officer Darrah directed those three men to leave the bar. Weekes' and Brown's argument with the man in the Red Sox shirt continued in the parking lot. Ultimately, Weekes and Brown walked towards one end of the parking lot, while the man in the Red Sox shirt went the other way.

Once back on the porch of Joe Angelo's Café, Darrah saw Weekes and Brown walking toward Crescent Street in the City Hall Annex driveway/parking lot, which was adjacent to the Joe Angelo's Café parking lot. Darrah heard what he thought was a gun shot. Darrah turned towards the sound and claimed that as Weekes and Brown walked behind a green screened fence which separated the two parking lots, he saw two gun muzzle flashes from behind the green screened fence and heard two additional gun shots.

Darrah's visual observation proved to be inaccurate. As demonstrated in the photographs contained in Defendant's Exhibit 1, Darrah claimed that he saw gun muzzle flashes from behind a portion of the green screened fence, but the shell casings for the gun shots were recovered more than 30 feet towards Crescent Street, behind a building which Darrah could not have seen through. Brockton Police Officer William Healy testified that

7

shell casings fall only a few feet from where a gun is discharged.

The defendant does not dispute that Darrah heard gun shots. What was demonstrated during the motion to suppress hearing was that Darrah could not have seen gun muzzle flashes. Importantly, Darrah could not have seen gun muzzle flashes coming from where Weekes and Brown were walking when the shots were fired. Had Darrah seen gun muzzle flashes coming from Weekes and Brown the shell casings would have been behind the green screened fence. When the shots were fired Darrah saw both Weekes and Brown behind the fence well before the small white wooden building which appears in the center of the middle photograph in Exhibit 1.

Accordingly, when Darrah ran to Crescent Street, he had no reason to suspect that either Weekes or Brown had fired a gun.[1] Even though Officer Darrah may have had reasonable suspicion -- based on the sound of gun fire -- that shots had been fired, Darrah had not seen either Weekes or Brown with a gun.[2] Darrah

---

[1] The defendant acknowledges that if Darrah had reasonable suspicion to stop Weekes and Brown, their flight would have transformed the reasonable suspicion into probable cause to search.

[2] Given that Officer Darrah could not have seen any muzzle flashes associated with the sound which he believed were (and in fact probably were) gun shots, it is questionable whether Darrah had developed reasonable

could not have seen a gun muzzle flash come from where Weekes and Brown were walking when the gun shots occurred. Neither Weekes nor Brown had previously exhibited conduct or an appearance which caused Darrah to believe that either was carrying a gun.

Because it was closing time at Joe Angelo's Café there were many people leaving the bar when the shots were heard. Accordingly, Officer Darrah could not have developed reasonable suspicion to stop either Weekes or Brown. He should not have chased them. While Darrah was chasing Weekes and Brown, neither did anything to indicate that they were involved in the discharge of a gun. Neither discarded a gun or items associated with guns. Darrah did not seize either a gun or the defendant's cell phone until he grabbed at Weekes and Brown while they were climbing the fence behind the Verizon Building.[3]

The phone was not abandoned. It was seized or knocked from

---

suspicion that gun shots had been fired. At the motion to suppress hearing, Officer Darrah justified his suspicion on both the noises he heard and the muzzle flashes he claimed to have, but could not have, seen.

[3] Interestingly, when Darrah testified about the portion of the fence which Weekes was climbing, he again misspoke. Officer Darrah stated that he grabbed Weekes when Weekes was trying to climb the tall narrow portion of fence which is to the left of Mr. Weekes in the top photograph of Defendant's Exhibit 4. Darrah told Officer Healy that Weekes climbed the larger but appreciably shorter portion of fence on which Mr. Weekes has his hands in the top photograph of Exhibit 4.

Weekes's clothing when Darrah used physical force upon Weekes by grabbing Weekes as he was climbing the fence behind the Verizon Building.  Accordingly, the Fourth Amendment limitations pursuant to Hodari D. do not come into play.  This Court, pursuant to Terry, should suppress the phone as evidence during the trial of the defendant.

**Respectfully Submitted,**
**JEROME WEEKES,**

**By his attorney:**

_____

**J. THOMAS KERNER**
**MA BBO # 552373**
**Attorney at Law**
**230 Commercial Street**
**Boston, MA  02109**
**(617) 720-5509**