**UNITED STATES OF AMERICA
DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

**CRIMINAL NO. 2004-10385-MEL**

**UNITED STATES OF AMERICA**

**V.**

**JEROME WEEKES**

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL**</u>

Now comes the defendant and files this memorandum in support of his motion for a new trial and for re-sentencing.

**Procedure.**

Currently, the defendant's appeal is pending in the Court of Appeals for the First Circuit. Pursuant to the procedure specified in <u>United States v. Graciani</u>, 61 F.3d 70,77 (1st Cir. 1995) and the First Circuit's February 20, 2008 order in response to the defendant's motion to stay the appellate proceedings and remand the case to the District Court so that a motion for a new trial may be filed (copy of order attached to motion for new trial), the defendant has filed his motion for a new trial and this memorandum with supporting exhibits.

> A criminal defendant who aspires to employ Rule 33 while his conviction is pending on direct appeal is not obliged either to file a motion for remand in the court of appeals or to seek any type of leave from that court. To the contrary, the proper procedure under such circumstances is for the defendant, without further ado, to file his Rule 33 motion in the district court. <u>See</u> <u>United States v. Phillips</u>, 558 F.2d 363, 363 (6th Cir.1977) (*per curium*). Once the motion has been so docketed, the district court has jurisdiction to entertain it notwithstanding the pendency of the

appeal, and may either deny it on the merits or indicate an intention to grant it. See United States v. Fuentes-Lozano, 580 F.2d 724, 725-26 (5th Cir.1978) (*per curium*); United States v. Frame, 454 F.2d 1136, 1138 (9th Cir.) (*per curium*), cert. denied, 406 U.S. 925, 92 S.Ct. 1794, 32 L.Ed.2d 126 (1972); see also United States v. Cronic, 466 U.S. 648, 666 n. 42, 104 S.Ct. 2039, 2051 n. 42, 80 L.Ed.2d 657 (1984) (noting correct procedural progression). If the district court denies the motion, the defendant may take a further appeal; and if the court proposes to grant the motion, it ordinarily will issue a written statement to that effect so that the defendant, armed with the advisory, may then request an order of remand from the appellate court. See Frame, 454 F.2d at 1138.

The First Circuit has adopted this protocol, requiring a Rule 33 motion to be filed initially in the district court when a direct appeal of a criminal conviction is pending. Graciani, at 77.

**Merits of Motion for New Trial.**

Since the date the jury convicted the defendant of possessing a firearm after previously being convicted of a crime punishable by more than a year in prison (18 U.S.C. § 922(g)(1), the defendant has obtained evidence not available at the time of the defendant's trial.  Had the evidence been available for the defendant's trial, the result of certain material rulings by the Court would have been different.  Had the Court's rulings been different it is substantially clear that the jury would have reached a different verdict.

Additionally, Associate Justice William G. Young issued a sentencing order in the matter of United States v. Kern Birkett, (Cr. No. 06-10139, D. Mass., August 21, 2007).  The government did not appeal Judge Young's sentencing order in Birkett.  The

2

Birkett order explains why this Court erred in ruling that two of the defendant's prior convictions were crimes of violence. Accordingly, the defendant should be re-sentenced.  The defendant acknowledges that subsequent to the Birkett order, the First Circuit issued its decision in United States v. Holloway, 499 F.3d 113 (1st Cir. 2007).  Holloway's request for a rehearing *en banc* is still pending.

A new trial based on newly discovered evidence pursuant to Rule 33 of the Federal Rules of Criminal Procedure ("Rule 33") must be filed with three years of the verdict.  Rule 33(b)(1). The grounds upon which to attack a final judgment pursuant to 28 U.S.C. § 2255 are limited to violations of the Constitution or laws of the United States.  28 U.S.C. § 2255; see also United States v. Addonizio, 442 U.S. 178, 184 (1979); Hill v. United States, 368 U.S. 424, 428 (1962) (explaining § 2255 provides relief from errors that are either constitutional or jurisdictional).

Where a claim for relief based on newly discovered evidence is based on actual innocence the claim is properly construed as a Rule 33 motion.  United States v. Guinan, 6 F.3d 468, 470-71 (7th Cir. 1993); Ruth v. United States, 266 F.2d 658, 660 (7th Cir. 2001); Sims v. United States, 1999 WL 1000855, (6th Cir. 1999).

A defendant who seeks to be re-sentenced or have his

3

conviction set aside on the ground of newly discovered evidence is claiming that the conviction was "erroneous" in the layman's sense -- it reached the wrong result -- but not that the trial judge committed reversible error.  A judge can hardly be faulted for having failed to give due weight to evidence that had not been known to exist at the time the defendant was convicted and sentenced.

A federal court does have the power to correct an error in a proceeding brought under the habeas corpus statute (§ 2254) or its federal-prisoner substitute (§ 2255).  Herrera v. Collins, 506 U.S. 390, 404 (1993) and Guinan, 6 F.3d at 470-71 (extending Herrera to §2255).  28 U.S.C., § 2255 provides, in pertinent part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255 (2000).

At anytime, without reference to the Rule 33 three year time limitation, a defendant my ask the Court to correct an error of a Constitutional nature.

4

1.   **The newly discovered evidence.**

  **a.**   On March 1, 2007, the District Court for the
District of Massachusetts issued its revised plan for random
selection of jurors, which replaced the plan which was used
by the District Court when the defendant was tried in
September 2006.  In September 2006 the jury selection
process was not "functioning as the [court's] Jury Plan
assumed they would."  <u>United States v. Green</u>, 389 F.Supp.2d
29, 58-59 (D.Mass) <u>rev'd sub nom</u>., <u>In Re United States</u>, 426
F.3d 1 (1st Cir. 2005).  Attached, as exhibits, are the
United States District Court For the District of
Massachusetts Plan for Random Selection of Jurors (Effective
March 1, 2007) (Ex. 1) and the Revisions to the Jury Plan of
the United States District Court for the District of
Massachusetts: Notes of the Jury Plan Committee (Ex. 2).

  **b.**   After the defendant's trial, Kelvin Brown learned
that the defendant was found guilty.  Mr. Brown sought out
the defendant and told him that he was shocked that Mr.
Weekes was convicted, given the lack of evidence.  Brown
told Weekes that he would speak with defense counsel.  (See
defendant's Motion for Release Pending Appeal, fn. 1, Dkt.
Entry 75, Ex. 3)

  Prior to Mr. Brown speaking with defense counsel, the
attorney who represented Brown in the related joint

5

prosecution of the defendant and Brown in the Brockton
District Court called defense counsel.  Defense counsel was
informed that Mr. Brown was going to speak with defense
counsel against the advise of the attorney who represented
Mr. Brown in the Brockton prosecution.  (Id.)

When defense counsel met with Brown, defense counsel
told Brown what Weekes claimed Brown had told Weekes prior
to trial.  Defense counsel then asked Brown if that was
accurate and would he speak to the Court and the prosecutor.
Brown asked defense counsel whether he would go to jail if
he spoke to the Court and the prosecutor.  Defense counsel
advised Brown to speak to a lawyer because there was a
potential that anything he said could be used to prosecute
him.

Brown spoke to two lawyers recommended by defense
counsel.  Both of those lawyers told defense counsel that,
just like before Weekes's trial, Brown would not make any
statements to defense counsel, the prosecutor or the Court
unless Brown was assured that he would not face criminal
prosecution.  Brown refused to retain either attorney to
make inquiry with the United States Attorney and the
Plymouth County District Attorney to determine whether Brown
would be prosecuted for gun charges.

One of the attorney's to whom Brown spoke agreed to

provide an affidavit regarding Brown.  That affidavit was attached to the defendant's Motion for Release Pending Appeal and is attached to this memorandum.  (Ex. 4)

**2.    Legal Argument in Support of New Trial and Re-Sentencing.**

    **A.    The District Court Should Have Dismissed the Jury *Venire* Which Was Composed Without Any African-Americans.**

The defendant is seeking a new trial pursuant to newly discovered evidence (Rule 33) and based on an argument that this Court violated the defendant's Constitutional rights when it denied the defendant's request to dismiss the all-white jury *venire* (28 U.S.C. § 2255).

In evaluating due process claims, courts should inquire whether the practice "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  <u>Snyder v. Massachusetts</u>, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934).  As stated by Justice Frankfurter, due process:

> embodies a system of rights based on moral principles so deeply imbedded in the traditions and feelings of our people as to be deemed fundamental to a civilized society as conceived by our whole history. Due process is that which comports with the deepest notions of what is fair and right and just.

<u>Solesbee v. Balkcom,</u> 339 U.S. 9, 16, 70 S. Ct. 457, 461, 94 L. Ed. 604 (1950).

The Sixth Amendment of the United States Constitution guarantees a criminal defendant the right to trial by an impartial jury.  The right to a trial by an impartial jury lies at the very heart of due process.  Irvin v. Dowd, 366 U.S. 717, 721-722, 81 S.Ct. 1639, 1641-1642, 6 L.Ed.2d 751 (1961). "[O]ur common-law heritage, our Constitution, and our experience in applying that Constitution have committed us irrevocably to the position that the criminal trial has one well-defined purpose -- to provide a fair and reliable determination of guilt." Estes v. Texas, 381 U.S. 532, 565, 85 S.Ct. 1628, 1644, 14 L.Ed.2d 543 (1965) (Warren, C.J., with whom Douglas and Goldberg, JJ., joined, concurring). That purpose simply cannot be achieved if the jury's deliberations are tainted by bias or prejudice.  Therefore, a defendant is entitled to a jury that will decide the charge according to the evidence presented in court and a jury that is free of outside influences.  Sheppard v. Maxwell, 384 U.S. 333, 351, 86 S.Ct. 1507, 1516, 16 L. Ed.2d 600, 613 (1966).

An impartial jury consists of nothing more than jurors who will conscientiously apply the law and find the facts. Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).  One aspect of being tried by an impartial jury is that the jury will be selected based upon racially

neutral criteria.  "[T]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." Batson v. Kentucky, 476 U.S. 79, 87 (1986).  Discriminatory selection procedures "undermine public confidence in the fairness of our system of justice." Id. at 87.  As the Supreme Court stated in Edmonson v. Leesville Concrete Co., Inc., 500 U.S. 614, 628, 111 S.Ct. 2077, 2087, 114 L.Ed.2d 660 (1991):

> Race discrimination within the courtroom raises serious questions as to the fairness of the proceedings conducted there. Racial bias mars the integrity of the judicial system and prevents the idea of democratic government from becoming a reality.

According to research on jury verdicts intended to present a comprehensive review of the empirical research on jury decision making published between 1955 and 1999,

> The model of decision making endorsed (at least implicitly) by most courts is one in which jurors are assumed to pay complete attention, withhold judgment until all of the facts are in, discard any information that the judge so instructs, and carefully weigh a host of intangible factors. Several decades of research on human cognition suggest that this model rarely, if ever, holds in the real world. Instead, decisions are based on past experience in the form of scripts, schemas, stereotypes, and other cognitive mechanisms as well as personal beliefs and values about what is right, wrong, and fair. . .  For instance, jury verdicts are influenced by the exposure of their jurors to pretrial publicity

and inadmissible evidence (e.g., Caretta
& Moreland, 1983 ; R. W. Davis, 1986 ;
Kerr et al., 1999 ; Kramer et al., 1990
; Padawer-Singer & Barton, 1975 ;
Thompson et al., 1981), and defendants
with prior felony convictions are more
likely to be found guilty (Blanck, 1985
; Borgida & Park, 1988 ; Hans & Doob,
1976) or sentenced to death (Baldus et
al., 1983; Barnett, 1985). *Jurors also
do not keep things separate as they are
expected to . . .*

*Jury Decision Making*: 45 Years of Empirical Research on
Deliberating Groups, Psychology, Public Policy, and Law
March 2000 Vol. 7, No. 3, 622-727.

The research was based upon 206 distinguishable studies
involving deliberating juries (actual or mock) were located
and grouped into 4 categories on the basis of their focal
variables: (a) procedural characteristics, (b) participant
characteristics, (c) case characteristics, and (d)
deliberation characteristics.  Id.

The Sixth Amendment requires that juries are selected
from pools representing a fair cross-section of the
community.  Duren v. Missouri, 439 U.S. 357, 363-64, 58 L.
Ed. 2d 579, 99 S. Ct. 664 (1979); see generally Nancy
Gertner & Judith H. Mizner, The Law of Juries, §§ 2-11-2-19
(1997).  Although petit juries need not mirror the exact
demographic composition of the community, the process of
selecting petit juries must give members of "cognizable"
groups a fair opportunity to serve (i.e., they may not be
systematically excluded from the pool). Taylor v. Louisiana,

419 U.S. 522, 538, 42 L. Ed. 2d 690, 95 S. Ct. 692 (1975).

In Duren, the Court outlined the requirements for finding a *prima facie* violation of the Sixth Amendment, albeit in very general terms.  Defendants must show:

> (1)  that the group alleged to be excluded is a "distinctive" group in the community [cognizable group prong];
>
> (2)  that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community [underrepresentation prong]; and
>
> (3)  that this underrepresentation is due to systematic exclusion of the group in the jury-selection process [systematic exclusion prong].

Id. at 364.

Utilizing this test, the First Circuit stated that the District Court's plan for selecting potential jurors (used at the time the defendant was tried) was flawed, in that the list of potential jurors undercounted African-Americans.  In re United States, 426 F.3d 1 (1st Cir. 2005).  As such, the Jury Plan Committee for the United States District Court for the District of Massachusetts subsequently revised its jury plan, thereby allowing for a more inclusive selection process.  ("Revisions to the Jury Plan").

In the instant case, during jury selection, defense counsel moved to discharge the entire *venire*, as not a single prospective juror was African-American.  (Excerpt

11

from Day 1 Trial Transcript (Ex. 5), pp. 24-25).  The court denied the motion, finding that nothing in the selection process suggested purposeful discrimination.  (Day 1 Transcript, p. 24).  Weekes submits that whether discrimination was purposeful is irrelevant according to the Duren decision.  What is relevant is the manner in which potential jurors are selected.  According to the Green decision and the subsequent Revisions to the Jury Plan as referenced above, African-Americans were improperly undercounted in jury compilation lists.

Given the response of the Jury Plan Committee for the District of Massachusetts, there can be little doubt that the juror selection process was not proper at the time of Weekes's trial.  Weekes's trial was in September 2006.  The Revisions to the Jury Plan were note promulgated until 2007. ("Revisions to the Jury Plan" Ex. 2).  As no Africa-Americans were among the potential jurors in this case, and the potential jurors were selected via a process that has been revised as it undercounted African-Americans, there can be little doubt that the Appellant's right to be tried by an impartial jury of his peers was denied.

As the district court failed to grant the defendant's request to dismiss the all white jury *venire*, resulting in a violation of the Appellant's Sixth Amendment rights, he

12

submits that his conviction must be vacated, especially now that it has been determined that the jury selection plan was flawed.

Given that the defendant is African-American, it is not necessary to explain how he was prejudiced by a flawed jury selection process which resulted in an all white jury and jury pool. Duren, at 363-64. Nevertheless, the defendant contends that a jury which included African-Americans would have been in a better position to decide the defendant's guilt or innocense. One of the important issues during the trial was whether Joe Angelo's was using hand held metal detectors the night of the incident. The all white jury may have disbelieved the defendant's testimony that the security at Joe Angelo's included screening with hand held metal detectors and believed the white police officer who said that metal detectors were not in use. A jury which included African-Americans, who are more likely than white folk to have some familiarity with hip-hop shows and the associated security measures used for crowd control, would have been more likely to credit the defendant's testimony about the hand held metal detectors.

It was the defendant's contention that since he and Brown twice had to clear through Joe Angelo's security neither he nor Brown could have had a gun the night they

13

were arrested.  The gun had to have come from the dark SUV
in which the man in the Red Sox shirt left Joe Angelo's
after his confrontations with Brown.

###    B.    The District Court Should Have Permitted the Appellant to Testify as to Statements Made By Kelvin Brown Against Brown's Penal Interest.

Hearsay is defined as a statement, other than one made
by the declarant while testifying, offered into evidence to
prove the truth of the matter asserted.  Fed.R.Evid. 801(c).
Hearsay is generally not admissible as evidence in a
criminal trial.  Fed.R.Evid. 802.  However, statements made
by another against their own penal interest are subject to
an exception to the hearsay rule, and can be admitted when
the declarant is unavailable for trial.  Fed.R.Evid.
804(b)(3).

Unavailability applies to those situations in which the
declarant:

    (1)   is exempted by ruling of the court on
         the ground of privilege from
         testifying concerning the subject
         matter of the declarant's statement;
         or

    (2)   persists in refusing to testify
         concerning the subject matter of the
         declarant's statement despite an order
         of the court to do so; or

    (3)   testifies to a lack of memory of the
         subject matter of the declarant's
         statement; or

    (4)   is unable to be present or to testify

14

> at the hearing because of death or
> then existing physical or mental
> illness or infirmity; or
>
> (5)  is absent from the hearing and the
>      proponent of a statement has been
>      unable to procure the declarant's
>      attendance (or in the case of a
>      hearsay exception under subdivision
>      (b)(2), (3), or (4), the declarant's
>      attendance or testimony) by process or
>      other reasonable means.

Fed.R.Evid. 804(a).

Although the wording of Rule 804 emphasizes the unavailability of the declarant, the crucial issue is whether the declarant's testimony is unavailable. <u>Federal Rules of Evidence: Rules, Legislative History, Commentary, and Authority</u> at § 804.2.  Weissenberger 1999.

Courts have consistently held that, pursuant to Rule 804(a)(5), a proponent of a hearsay exception must show at least good faith, genuine, and bona fide effort to procure witness' attendance.  <u>United States v. Mann</u>, 590 F2d 361 (1st Cir. 1978).  The language of Rule 804(a)(5) suggests that "other reasonable means" besides subpoenas must be tried before a witness can be found unavailable.  <u>Id</u>. at 367.  This relatively high good faith standard cannot be satisfied by perfunctory efforts.  <u>Id</u>.  Generally, a defendant may not utilize a hearsay exception when the proponent of the exception failed to attempt to make the declarant available through the serving of a subpoena.

15

United States v. Puckett, 692 F.2d 663 (10th Cir. 1982).

In the instant case, Weekes attempted to introduce a statement against penal interests made by Kelvin Brown, but was disallowed from doing so by the district court. (Excerpt from Day 3 Trial Transcript (Ex. 6), pp. 9-10). The court found that Weekes had failed to show that Brown was unavailable to testify. (Day 3 Transcript, p. 10) Counsel noted that Weekes had run into Brown prior to trial, and that Brown, asked if he would relate his involvement in the instant matter, stated "[n]o, I'm not getting involved. This is your problem." (Day 3 Transcript, p. 10).[1] Further attempts to contact Brown were unsuccessful. (Day 3 Transcript, p. 10). Weekes claimed that Brown stated that he possessed the firearm at issue. (Day 3 Transcript, p. 9).

The Court should have permitted Weekes to tell the jury that Brown admitted to picking up the gun. First, even if

---

[1]

The post-trial affidavit by Attorney Dominguez (Ex. 4) demonstrates that the representations by defense counsel were accurate. Brown's testimony was and still is unavailable. Even if Weekes's attorney had managed to get Brown into court, he wasn't going to testify without a grant of immunity. Brown was unavailable. The Dominguez affidavit additionally corroborates Weekes's representations, through counsel, that Brown had a basis to refuse to testify based on his Fifth Amendment rights. Brown was with Weekes when Weekes was arrested on October 23, 2004. In fact, both Weekes and Brown were initially charged with possessing the gun by the Brockton Police.

16

greater efforts, such as the issuance of a subpoena had been utilized, it is clear that Brown did not plan to testify. As such, Brown's *testimony* was unavailable regardless of the efforts made by Weekes.  Second, as Brown could not be found, Weekes did not have a location at which to issue the subpoena.  United States v. Winn, 767 F.2d 527, 531 (9th Cir. 1985)("The law does not require the doing of a futile act," and the extent of the efforts the prosecutor must make is a question of reasonableness.).  Attempting to locate Brown via his known contacts, such as an old girlfriend, mother, and known associates was the only logical and reasonable step that could have been taken by the Appellant. (Day 3 Transcript, p. 10).  Clearly, despite Weekes's best efforts, Brown's testimony was not available for trial.  The newly obtained Dominguez affidavit (thus this motion pursuant to Rule 33) confirms Brown's continued unavailability.

As Brown's testimony was unavailable for trial, his statement against penal interest should have been admitted by this court.  Had the statement at issue been admitted, it would have been clear that Weekes  did not possess the firearm at issue and Weekes would not have been fond guilty in this matter.  As such, Weekes submits that his conviction must be vacated.

17

**C.    Regardless Wether this Court Denies or Allows the Defendant's Motion for a New Trial, the Defendant Should Be Re-sentenced.**

As explained above, in addition to seeking a new trial pursuant to Rule 33, the defendant is requesting re-sentencing pursuant to 28 U.S.C. § 2255.

Subsequent to when the defendant was sentenced (July 9, 2007), There was an exhaustive order issued by Associate Justice Young in the matter of <u>United States v. Kern Birkett</u>, (Cr. No. 06-10139-WGY)(D. Mass. August 21, 2007)(Ex. 7).  The United States did not appeal Judge Young's order. Judge Young's 24 page order in <u>Birkett</u>, explains carefully why this Court should have ruled in the instant matter that the defendant's convictions for assault and battery (PSR prg. 38) and resisting arrest (PSR prg. 48) cannot be considered crimes of violence for purposes of 18 U.S.C § 924(e)(1) [the ACCA].  This Court's ruling that the paragraph 38 and 48 convictions were crimes of violence violated the defendant's Sixth Amendment rights pursuant to Supreme Court's rulings in <u>Apprendi v. New Jersey</u>, 530 U.S. 466, (2000); <u>Jones v. United States</u>, 525 U.S. 227, 243 n.6 (1999) and <u>Shepard v. United States</u>, 544 U.S. 13 (2005).

The Massachusetts assault and battery and resisting arrest statutes each cover two separate crimes, one involving actual or potential physical harm and the other

19

involving a non-consensual but unharmful touching.  As such, unless the Court is presented with something other than a police report or a charging document which indicates that the defendant used violence, an assault and batter or resisting arrest conviction in Massachusetts cannot be considered a crime of violence for purposes of the ACCA. Birkett, at pp. 11-14, citing Shepard, at 24 (reversing the 1st Circuit's use of disputed police reports and boilerplate charging language).

Unless a sentencing court is presented with a judicial finding or an admission by the defendant that violence was used during the commission of an assault and battery or resisting arrest, those convictions cannot be considered crimes of violence.  The defendant in his Supplemental Filing in Support of Sentencing Memoranda, docket entry 76, (Ex. 8) and Supplemental Sentencing Memorandum, docket entry 64 (Ex. 9) made this same argument.  Admittedly, Judge Young's Birkett order addresses the Shepard issues to a much greater extent then did the defendant in his sentencing filings.

Accordingly, based on Judge Young's August 21, 2007 Birkett decision, which was not appealed by the government, this Court should re-sentence the defendant without regard to the ACCA.

Respectfully Submitted,
JEROME WEEKES,

By his attorney:


_____
J. THOMAS KERNER
MA BBO # 552373
Attorney at Law
343 Commercial St. Unit 104
Boston, MA  02109
(617) 720-5509

UNITED STATES OF AMERICA
DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CRIMINAL NO. 2004-10385-MEL


UNITED STATES OF AMERICA

v.

JEROME WEEKES

<u>EXHIBITS IN SUPPORT OF MOTION FOR NEW TRIAL AND RE-SENTENCING</u>


| <u>EXHIBIT NO.</u> | <u>DESCRIPTION</u> |
|---|---|
| 1 | U.S. Dist. Court's Plan for Random Selection of Jurors (Effective March 1, 2007) |
| 2 | Rivisions to the Jury Plan of the U.S. Dist. Court, Notes of the Jury Plan Committee |
| 3 | Counsel's Affidavit Consistent with Footnote 1 from Defendant's Motion for Release Pending Appeal [Dkt. Entry 75]) |
| 4 | Affidavit of Attorney Carlos Dominguez |
| 5 | Excerpt from Day 1 Trial Transcript |
| 6 | Excerpt from Day 3 Trial Transcript |
| 7 | Sentencing Order in <u>U.S. v. Birkett</u> |

Respectfully Submitted,
JEROME WEEKES,

By his attorney:

_____
J. THOMAS KERNER
MA BBO # 552373
Attorney at Law
343 Commercial St. Unit 104
Boston, MA  02109
(617) 720-5509

UNITED STATES OF AMERICA
DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CRIMINAL NO. 2004-10385-MEL


UNITED STATES OF AMERICA

v.

JEROME WEEKES

**EXHIBIT 1 IN SUPPORT OF MOTION FOR NEW TRIAL AND RE-SENTENCING**


U.S. Dist. Court's Plan for Random Selection of
Jurors (Effective March 1, 2007)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**PLAN FOR RANDOM SELECTION OF JURORS**
**(Effective March 1, 2007)**

Pursuant to the Jury Selection and Service Act of 1968, as amended, 28 U.S.C. §1863, the Court adopts the following Plan for the Random Selection of Jurors (the "Plan").

This Court utilizes the one-step summoning and qualification procedure, as authorized by 28 U.S.C. §1878. Accordingly, jurors shall be qualified and summoned in a single procedure.

## 1.    DEFINITIONS

For purposes of the Plan, the Clerk shall mean the Clerk of the Court, any authorized deputy clerks, and any other person authorized by the Court to assist the Clerk in the performance of functions under this Plan. The "Jury Commissioner" shall mean the Jury Commissioner for the Commonwealth of Massachusetts or his designees. The Jury Commissioner is hereby authorized to assist the Clerk in the performance of producing the Master Jury Wheel.

## 2.    APPLICABILITY

Pursuant to 28 U.S.C. S1869(e), the Master Jury Wheel for the District of Massachusetts is hereby divided into three divisions for petit and grand jury selection, as follows: **Eastern Division**: The Counties of Essex, Middlesex, Suffolk, Norfolk, Bristol, Plymouth, Barnstable, Dukes, Nantucket. **Central Division**: The County of Worcester. **Western Division**: The Counties of Franklin, Hampshire, Hampden, and Berkshire.

## 3.    DISCRIMINATION PROHIBITED

No citizen shall be excluded from service as a grand or petit juror on account of race, color, religion, sex, national origin or economic status.

## 4.    MANAGEMENT AND SUPERVISION OF JURY SELECTION PROCESS

The Clerk shall manage the jury selection process under the general supervision of the Chief Judge or his designee.

## 5.    RANDOM SELECTION FROM CROSS-SECTION OF THE COMMUNITY

a.    It is the policy of this Court that all citizens of this district shall have the opportunity to be considered for service on grand and petit juries and to ensure, to the greatest extent possible, that all grand and petit juries in the three divisions of the District of Massachusetts are drawn at random from source lists in the relevant division, that represent a fair cross-section of the community of that

division. All citizens shall have an obligation to serve as jurors when summonsed for the purpose of serving on grand and petit juries.

b.    In order to implement the Court's policy, the Clerk shall take the following steps, beginning on or after the effective date of this Plan. In the first step, described as the "initial" draw in paragraph 7 of this Plan, the Clerk, or his or her designee, shall select at random, from the Master Jury Wheel, the names of persons to whom summonses will be issued for service as grand or petit jurors. The Master Jury Wheel in use as of the effective date of this Plan, however, may be used until it is emptied according to law. In the second step, described as the "supplemental draw," in paragraph 8 of this Plan, the Clerk shall select the name of a person at random, from the Supplemental Jury Wheel, to whom an additional summons will be issued, according to the procedures described in paragraph 8, for each summons returned to the Court as "undeliverable" by the United States Postal Service. The source and composition of the Master Jury Wheel and the Supplemental Jury Wheel are described in paragraph 6 of this Plan.

6.    **MASTER JURY WHEEL, SUPPLEMENTAL JURY WHEEL**

a.    **Master Jury Wheel**

i.    The Clerk shall request that the Massachusetts Jury Commissioner ("MJC") utilize the random selection procedures outlined in the MJC's regulation entitled "Specification of Random Selection Methods and Procedures (describing the use by the MJC of the Marsaglia Random Number Generator) for the selection of the names to be placed in the Master Jury Wheel for each division, so that each county shall be represented in proportion to the number of names on its resident lists.

ii.   The Court finds that electronic data processing methods can be advantageously used for selecting and copying names from the municipal resident lists for inclusion in the Master Jury Wheel. Therefore, the Clerk shall use a purely randomized process, through a properly programmed electronic data processing system, to obtain names from the municipal resident lists for inclusion in the Master Jury Wheel. In selecting names for the Master Jury Wheel, however, the Clerk shall maintain the substantial proportionality of names for each county in accordance with 28 U.S.C. § 1863(b)(3).

iii.  The Master Jury Wheel shall consist of the names and addresses of all persons randomly selected from the municipal resident lists as described above. The physical form of record on which names from the Master Jury Wheel are kept may include labels or such electronic devices as magnetic tapes or disc files.

iv.    Initially, the Clerk shall place in the Master Jury Wheel the number of names that are perceived to be needed in order to provide qualified jurors for the Court, but this number shall always be at least 35,000 names for the Eastern division, 4,000 names for the Central division and 4,000 names for the Western division. The Clerk shall empty and refill the Master Jury Wheel once every year during the period between January 1st and April 30th in conformance with this Plan or at more frequent intervals as deemed necessary or expedient by the Clerk under the supervision of the Chief Judge. The Chief Judge, or his designee, may order additional names to be placed in the Master Jury Wheel at other times, as needed, in accordance with Paragraph 6(a)(i) of this Plan.

b.    **The Supplemental Jury Wheel**

Using the procedures described in paragraph 6 (a) (i)-(iv) above, the Clerk shall create a Supplemental Jury Wheel for the purposes described in paragraphs 5 (b) and 8 of this Plan.

c.    **National Change of Address Database**

The Clerk shall submit the names on the Master Jury Wheel and the Supplemental Jury Wheel twice a year to be updated through the national change-of-address system of the United States Postal Service .and corrected as appropriate before issuing summonses.

7.    **METHOD AND MANNER OF RANDOM SELECTION FOR INITIAL DRAW**

a.    The Clerk, either at one time or at periodic intervals, shall publicly draw at random from the Master Jury Wheel, the names of as many persons as may be required based upon the anticipated juror demands by the Court. The number of names, plus additional names sufficient to compensate for the estimated number of prospective jurors who will be unavailable or ineligible, shall be determined by the Court.

b.    The Clerk, by automated or manual means, shall prepare and cause to be mailed to every person whose name is drawn, a one-step juror summons/qualification form, accompanied by instructions to complete and return the form to the Clerk by first-class mail, duly signed and sworn, within ten days from the receipt of the form, in accordance with 28 U.S.C. § 1864(a).

c.    The Clerk shall issue summonses to the persons so drawn and serve the summonses by registered, certified or first class mail, as the Clerk shall determine with the approval of the Chief Judge, addressed to each such person at his or her usual residence or business address.

8. **METHOD AND MANNER OF RANDOM SELECTION FOR SUPPLEMENTAL DRAW FOR "UNDELIVERABLES"**

   a. For each summons returned by the United States Postal Service to the Court as "undeliverable," the Clerk shall draw at random from the Supplemental Jury Wheel the name of a resident who lives in the same zip code area to which the undeliverable summons had been sent and prepare and cause to be mailed to such resident a new one-step juror summons/qualification form.

   b. The Clerk shall submit the names and addresses of the "undeliverables" to the Office of the Jury Commissioner of Massachusetts ("OJC"), so that the OJC may also update its lists.

9. **QUALIFICATIONS, EXEMPTIONS, AND EXCUSES FROM JURY SERVICE**

   a. **Qualifications**

   Under the supervision of the Court, the Clerk, shall determine, solely on the basis of information provided on the juror qualification form and other competent evidence, whether a person is unqualified for, or exempt, or to be excused from jury service. The determination shall be noted in the space provided on the juror qualification form or on supporting documentation. Any person shall be deemed qualified for jury service unless he or she:

   i. is not a citizen of the United States;

   ii. is less than eighteen years of age;

   iii. has not resided within the judicial district for a period of one year or more;

   iv. is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form;

   v. is unable to speak the English language;

   vi. is unable, by reason of mental or physical infirmity, to render satisfactory jury service; or

   vii. has a charge pending against him/her for the commission of, or has been convicted in a State or Federal Court of record of, a crime punishable by imprisonment for more than one year, and his/her civil rights have been lost and have not been restored.

   b. **Exemptions**

The following classes of persons are exempt from jury service:

    i.    members in active service in the armed forces of the United States;

    ii.    members of the fire or police departments of any state, district, territory, possession or subdivision thereof;

    iii.    public officers in the executive, legislative, or judicial branches of the government of the United States, or any state, district, territory, or possession or subdivision thereof, who are actively engaged in the performance of official duties. Public officer shall mean a person who is either elected to public office or who is directly appointed by the person elected to public office.

**c.    Excuses**

The Clerk, upon individual request, shall excuse the following classes of persons:

    i.    any person over the age of 70 years old;

    ii.    any person who has served at least 5 days of state jury service or any federal jury service within the last 3 years;

    iii.    volunteer safety personnel who serve without compensation as firefighters or members of a rescue squad or ambulance crew for a public agency in accordance with 28 U.S.C. §1863(b)(5)(B). (Public agency shall mean the United States, the Commonwealth of Massachusetts, or any unit of municipal government, department, or instrumentality of the foregoing.)

Under the supervision of the Court, the Clerk, upon individual request showing undue hardship or extreme inconvenience, may excuse any person from jury service for the period that such extreme hardship or inconvenience exists. "Undue hardship or extreme inconvenience" shall mean illness of the juror or a member of the juror's household; the active care and custody of a child under ten years of age; the active full-time care of an aged or infirm person; or business or recreational travel plans established before the receipt of the summons for jury service.

**10.    MISCELLANEOUS**

    a.    No person shall make public or disclose to any person not employed by this Court the names drawn from the Master Jury Wheel until the jurors have been summoned and have appeared, or failed to appear, in response to the summons. Any judge of this Court may order that the names of jurors remain confidential thereafter if the interests of justice so require.

b.   The names of any jurors drawn from the Master Jury Wheel and selected to sit on a Grand Jury shall be kept confidential and not made public or disclosed to any person not employed by the Court, except as otherwise authorized by a court order in an individual case pursuant to 28 U.S.C. § 1867(f).

c.   If a judge of this Court finds that a case requires a large array of jurors but it later appears that the array is larger than necessary, the Clerk shall draw by lots the surplus jurors and assign them as is or appears appropriate. Jurors left over in the array of jurors summoned for grand jury or petit jury service may be called in at the next impaneling of a grand jury or petit jury, together with those jurors who were temporarily excused.

d.   From time to time, the Court may direct the Clerk to draw from the Master Jury Wheel, in accordance with Paragraph 7 of this Plan, such number of persons as may be required for additional arrays. An "additional" array" shall mean a small list of prospective grand or petit jurors which may be added to a regular array of such jurors as necessary when a regular array requires additional names because of excused or increased jury requirements. When added to the regular array, the additional array shall then become a part of the regular array.

_____
Mark L. Wolf, Chief U.S. District Judge

_____
Joseph L. Tauro, U.S. District Judge

_____
Rya W. Zobel, U.S. District Judge

_____
William G. Young, U.S. District Judge

_____
Douglas P. Woodlock, U.S. District Judge

_____
Nathaniel M. Gorton, U.S. District Judge

_____
Richard G. Stearns, U.S. District Judge

_____
Reginald C. Lindsay, U.S. District Judge

_____
Patti B. Saris, U.S. District Judge

_____
Nancy Gertner, U.S. District Judge

_____
Michael A. Ponsor, U.S. District Judge

_____
George A. O'Toole Jr., U.S. District Judge

_____
F. Dennis Saylor IV, U.S. District Judge

UNITED STATES OF AMERICA
DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 2004-10385-MEL

UNITED STATES OF AMERICA

v.

JEROME WEEKES

**EXHIBIT 2 IN SUPPORT OF MOTION FOR NEW TRIAL AND RE-SENTENCING**

Revisions to the Jury Plan of the U.S. Dist.
Court, Notes of the Jury Plan Committee

**Revisions to the Jury Plan of the
United States District Court for the District of Massachusetts:
Notes of the Jury Plan Committee**

The Jury Plan Committee (the "Committee") of the United States District Court for the

District of Massachusetts has proposed, and the District Court has accepted certain revisions to

the Jury Plan of the United States District Court for the District of Massachusetts. These

revisions are reflected in the attached redlined version of the plan.

I.    Introduction

    A.    The Statutory Framework

The Jury Selection and Service Act ("JSSA"), 28 U.S.C. §§ 1861-1878, provides:

> It is the policy of the United States that all litigants in Federal
> courts entitled to trial by jury shall have the right to grand and petit
> juries selected at random from a fair cross section of the
> community in the district or division wherein the court convenes.
> It is further the policy of the United States that all citizens shall
> have the opportunity to be considered for service on grand and petit
> juries in the district courts of the United States and shall have an
> obligation to serve as jurors when summoned for that purpose.

28 U.S.C. § 1861. Section 1862 of the JSSA prohibits discrimination, namely, the exclusion of

persons from federal jury service "on account of race, color, religion, sex, national origin, or

economic status." 28 U.S.C. § 1862. In addition, § 1863 of the JSSA requires each United

States District Court to develop a written plan that will affirmatively meet the statute's

objectives. *See* 28 U.S.C. § 1863. For most federal districts, the JSSA provides that jurors are to

be drawn from either voter registration lists or lists of actual voters of the political subdivisions

within the district or division, supplemented as necessary to achieve the objectives of the JSSA.

Before 1989, this court selected potential jurors from voter registration lists. In 1989, the

court amended its Jury Plan, with the approval of a reviewing panel of the Judicial Council of the

First Circuit, as required by § 1863(a) of the JSSA. Acting pursuant to the provision of

§1863(b)(2) of the JSSA, which requires supplementation of voter lists, where necessary, the

court authorized the selection of potential jurors from the numbered local resident lists prepared

annually by the 351 cities and towns in Massachusetts. Pursuant to Mass. Gen. Laws ch. 234A

§ 10, each city and town in Massachusetts is required annually to make a sequentially numbered

list of the names, addresses, and dates of birth of all persons over the age of seventeen residing in

the municipality and to submit that list to the Office of the Jury Commissioner. The court made

an express finding in the 1989 amendment to its Jury Plan that the resident list "includes all

registered voters, supplemented by all residents not registered to vote and represents a fair cross

section of the community in this District." The 1989 amendment, in the language of

§1863(b)(2), therefore "supplemented" the list of registered voters with the annual resident lists.

(In the proposed revision to the Jury Plan, this finding has been eliminated as superfluous in light

of the amendment to the JSSA discussed in the following paragraph.)

In 1992, Congress amended the JSSA to provide for the primary use of the annual

resident lists by the District of Massachusetts. Pub. L. No. 102-572 § 401, 1992 U.S.C.C.A.N.

(106 Stat. 4506), 1992 W.L. 309178 *6. In permitting this "Massachusetts exception" to the use

of voter lists or voter registration lists, as the source of the court's jury pools, Congress

explained:

> The Jury Act . . . requires that, with limited exceptions, prospective
> jurors must be selected from voter lists. In order to obtain better
> representation of minorities and otherwise advance the policy of
> universal service, district courts may supplement voting lists, but
> they are not authorized to supplant them. Uniquely in the State of
> Massachusetts, however, an alternative to voter lists exists that
> both improves the representativeness of juries and enhances

2

> administrative efficiency. This section allows the district of
> Massachusetts to rely on this alternative source, a comprehensive
> residents list exclusively.

H.R. Rep. 102-1006(I), *23, 102nd Cong., 2nd Sess. 1992, 1992 U.S.C.C.A.N., **3932; S. Rep.

102-342, 102nd Cong., 2nd Sess. 1992, 1992 WL 187372 (same).

In turning to the numbered resident lists as the source for jury pools, this court and

Congress concluded that the annual requirement of the cities and towns to produce a list of the

names, addresses, and dates of birth of its residents over the age of seventeen would produce the

most comprehensive and fairest accounting of persons eligible for jury service possible in

Massachusetts.

B.    Litigation

Over the years defendants in criminal cases have raised constitutional challenges to the

representativeness of jury venires in this court. The First Circuit has rejected all of such

challenges, concluding in each case that the defendant had not made out a *prima facie* case of a

violation of the fair cross-section guarantee of the Sixth Amendment, and, in one case, that the

defendant had not made out a *prima facie* case of a violation of the cognate, statutory fair cross-

section requirement.

For example, in *United States v. Hafen*, 726 F.2d 21 (1st Cir. 1984), the defendant

unsuccessfully asserted that the jury venires in the Eastern Division – that part of the District of

Massachusetts comprising all counties east of Worcester County – underrepresented African-

Americans. As noted above, at the time of that challenge, the source list for jury pools in the

Eastern Division was voter registration lists, rather than the resident lists. *Id.*

3

In *United States v. Pion*, 25 F.3d 18 (1st Cir. 1994), the defendant asserted that jury venires in the Eastern Division underrepresented Hispanics. The district judge in that case found, and Pion did not dispute, that "the broadest data available – resident lists – are used to make up the Master Jury Wheel from which Eastern Division jury venires are drawn." *Id.* at 23. Thus the First Circuit concluded that "since the names included in the Master Jury Wheel are randomly drawn from the most inclusive data available . . . there can be no reasonable inference that the jury-selection process systematically excludes Hispanics at any stage . . . ." *Id.*

In *United States v. Royal*, 174 F.3d 1 (1st Cir. 1999), a defendant, for the first time, challenged the proposition that the resident lists themselves represent a fair cross-section of the community of the Eastern Division. *Id.* at 1, 11. Royal argued that the lists underrepresented African-Americans, and that the underrepresentation amounted to a systematic exclusion of African-Americans from Eastern Division juries, in violation of the Sixth Amendment. *Id* at 11. He argued further that the constitutional violation was exacerbated by the failure of the selection process to provide for follow-up as to undelivered and returned summonses, a large proportion of which were traceable to areas with significant African-American populations. *Id.* Based on the record before it, the First Circuit rejected the challenge.

The most recent constitutional challenge to the court's Jury Plan – and the impetus for formation of the Committee – was *United States v. Green*, 389 F. Supp. 2d 29 (D. Mass.) *rev'd sub nom., In Re United States*, 426 F.3d 1 (1st Cir. 2005). The defendants in *Green*, who were African-Americans, contended that the composition of the jury wheel for the Eastern Division violated both the Sixth Amendment of the Constitution and the JSSA because it was developed from resident lists that are inaccurate and out of date, and that these deficiencies were most acute

4

in cities and towns (and in zip code areas within municipalities) with the highest percentages of African-Americans. *Green,* 389 F. Supp. 2d at 35-36. The district judge in *Green* had before her an extensive record concerning the operation of the resident lists, including statistical data, responses to questionnaires from all of the city and town clerks of the Eastern Division as to the manner in which each compiles its resident list, expert reports and voluminous briefing. *Id.* at 39. The factual questions concerning the jury issues were examined over several days of hearings. *Id.*

On the basis of all the evidence, the district judge found that the resident lists were not "functioning as the [court's] Jury Plan assumed they would." *Id.* at 58-59. She found, among other things, that "the resident lists undercount African-American from the outset... [and that in many cities and towns the resident lists] are not improved and updated annually as required by state law, resulting in disproportionately high rate of undeliverable and nonresponses in heavily African-American poor, and urban communities" *Id.* at 59. The district judge concluded, however, that the defendant had not met the First Circuit's standards for a constitutional violation, even in light of what the court found to be demonstrable defects in the exclusive use of resident lists as the source from which the jury pools are chosen. *Id* at 63.

On the other hand, the district judge sustained the defendants' statutory challenge to the court's jury selection process, ruling that the court as a whole had a duty under the JSSA to supplement the resident lists to address problems that compromised the capacity of the resident lists to produce jury pools from a fair cross-section of the community of the Eastern Division. *Id.* at 69-72. The failure of the court and its personnel to discharge that duty amounted to a substantial failure to comply with the JSSA, the district judge held. To remedy the violation of

5

the JSSA she found, the district judge ordered, for the *Green* case, that, for all summonses returned to the court as undeliverable, new summonses would be mailed to residents living in the same zip code area as the undeliverable summonses. The same procedure would be followed with respect to summonses to which there was no response after a second mailing; in other words, for all summonses for which there was no response after a follow-up second summons, new summonses would be sent to residents in the same zip code area as the nonresponders.

On the government's petition for the issuance of a writ of mandamus, the Court of Appeals for the First Circuit ruled that the remedial order of the district court in *Green* did not comport with the court's Jury Plan and was not justified, in any event, because the Jury Plan did not violate the JSSA. *In re United States*, 426 F.3d 1, 5-6 (1st Cir. 2005). Furthermore, the Court of Appeals ruled, the remedy ordered by the district judge amounted to a *de facto* amendment of the Jury Plan, which an individual judge of the court is not permitted to do under the JSSA. *Id*. at 7.

C.     The Proposed Revision

Notwithstanding the ruling of the Court of Appeals as to the necessity and propriety of the order entered by the district judge in *Green*, the factual findings of the district judge raised an important question, one with which this court is deeply concerned: whether the determination the court made in 1989 that the annual resident list "represents a fair cross-section of the community in this District" continues to be appropriate under circumstances now existing. The Jury Plan Committee thus was established by then Chief Judge William G. Young to review the court's Jury Plan in light of the district court's findings in *Green*. As originally established, the

6

Committee consisted of five judges of this court. The clerk and two members of her staff were added to the Committee shortly after the Committee's first meeting.

A primary focus of the Committee has been to determine whether there exist more reliable sources of data on Massachusetts residents than the annual resident lists that may be used in putting together the Master Jury Wheel for this district. The Committee considered a number of alternative proposals for source data.

The Committee followed with particular interest a proposal that was then pending in the Massachusetts Legislature for a comparative study of the reliability and accuracy of the residential data in the annual resident lists and residential data that would be in a list denominated "the administrative records list" and derived from a compilation of information maintained in the electronic databases of the Secretary of State, the Registry of Motor Vehicles, the Department of Revenue, the Board of Higher Education, the Department of Transitional Assistance, the Office of Medicaid, the Department of Public Health and the Division of Unemployment Assistance. The proposal was for a three-year study of whether residential data for use in developing jury pools could be more reliably obtained from the administrative records list than from the annual resident lists. In the spring of 2006, the Legislature rejected this proposal. Thus, an avenue for the study of an alternative to the annual resident lists has been foreclosed, at least for the time being. However, if the Committee determines, in its future work, that the administrative records list or some other source of residential data is more reliable than the annual resident lists, the Committee expects to propose a comprehensive revision to the court's Jury Plan to make use of that data, either in a substitution for, or in supplementation of, the annual resident lists as the source of names for the court's Master Jury Wheel.

7

In the meantime, the Committee has proposed the revision to the court's Jury Plan transmitted with this statement. As amended, the Jury Plan would permit the court's Jury Department to issue a new summons to a randomly selected person in the zip code area for each original summons returned to the court as undeliverable from that zip code area. Undeliverability of an original summons would be the only criterion for the issuance of a new summons; beyond that, the revised Jury Plan envisions no geographic or other targeting for a second-round mailing of summonses. This procedure would be used in each of the court's three divisions.

Although not required to do so by statute, the Committee, as directed by the court, gave notice to the Bar of the proposed revisions to the Jury Plan and invited comments on a draft of the revisions. The Committee received five letters commenting on the Jury Plan from the United States Attorney; the Boston Bar Association; Pamela Wood, Jury Commissioner of Massachusetts; Patricia Garin of Stern Shapiro Weissberg & Garin LLP; and Jack E. Robinson Esq. In addition, the court solicited and received comments on the proposed revision from the General Counsel's office of the Administrative Office of the United States Courts (the "AO"). The comments were generally favorable. All of them were carefully considered by the Committee and reported to the court. All of the comments informed the Committee's deliberative processes, and several suggestions of the commentators were incorporated into the present revision of the Jury Plan. Additional suggestions that were more far-reaching than the changes the Committee proposed remain under study by the Committee.

To accomplish the changes in the Jury Plan contemplated by the present revision, the Committee proposed and the court approved substantive changes in paragraphs 5 and 6 and the

8

addition of new paragraphs 7 and 8 to the existing Jury Plan. In summary, these changes

establish a Master Jury Wheel from which an initial draw of potential jurors is to be made and a

Supplemental Jury Wheel from which a draw of potential jurors will be made to replace those

potential jurors randomly drawn from the Master Jury Wheel whose summonses were returned as

undeliverable. The wheels will be identical in size, and each will be created in accordance with

the Massachusetts Jury Commissioner's random selection procedures outlined in the

Commissioner's regulation entitled "Specification of Random Selection Methods and Procedures

(describing the use by the Commissioner of the Marsaglia Random Number Generator). A

separate supplemental wheel is necessary to prevent any compromise in geographic

proportionality that might result if the supplemental draw were made directly from the Master

Jury Wheel. *See* 28 U.S.C. 1863(b)(3) (requiring that each political subdivision within a judicial

district or division be "substantially proportionally represented in the master jury wheel for that

judicial district [or] division"). As revised, these paragraphs also prescribe the manner by which

random selection is to be made both for the initial draw and the supplemental draw.

The revised Jury Plan also provides that the names in both the Master Jury Wheel and the

Supplemental Jury Wheel be submitted twice a year to the national change-of-address system of

United States Postal Service and corrected for misstated address information before any

summonses are issued. Until earlier this year, the court's Jury Department had submitted names

in the Master Jury Wheel to the change-of-address system annually. The Committee directed the

Jury Department to make the submission twice a year before any revision in the Jury Plan was

proposed. The revised Jury Plan will formalize that procedure and include the submission of

names in the Supplemental Wheel in the change-of-address inquiry. In addition, the Committee

9

directed the Jury Department to lengthen from six to ten weeks the period between issuance of the jury summons and the date a potential juror is expected to appear for service.

As we noted at the outset of this commentary, the policy of the JSSA goes beyond simply the elimination of discrimination. The JSSA seeks to ensure to all litigants entitled to a jury trial in the federal courts the right of a jury drawn at random from a fair cross section of the community of the relevant division of the district. The more inclusive the source list for a court's jury pool, the better may the court achieve that goal. There is no perfect source of potential jurors; voter registration lists, lists of actual voters, and annual resident lists have all proven to have flaws. It is likely that any new source, like an administrative records list, will also have flaws. The question is what source gives us the closest approximation of the fair cross-section ideal. Answering that question remains the Committee's principal work.

This much is certain: the more flawed the source of potential jurors for the Master Jury Wheel, the more tension there will be between the JSSA's "randomness" requirement, on the one hand, and the "fair cross-section" requirement on the other. A random draw from less than accurate lists exalts one goal over the other. The present revision of the Jury Plan attempts to restore the balance between the two.

The revised Jury Plan aims at reducing the tension inherent in an imperfect system. In the end, we expect that, with an initial and supplemental draw, as discussed above, together with improvements in the way the court tests the accuracy of residential information and issues summonses for jury service, and with juror educational programs that the court is now considering, the court can achieve an overall improvement in its ability to develop a jury pool

10

that assures that every litigant entitled to a jury trial in this district will get a jury randomly selected from a fair cross section of the community of the relevant division of the district.

The Committee emphasizes that the proposed Jury Plan revision will apply to all communities, not simply those with high minority populations or where a specific problem with a city or town census may have arisen. While the Committee expects that the number of minorities on jury panels is likely to increase under the proposal, any such increase is likely to be a by-product of an improved response rate in those cities and towns that have both substantial minority populations and outdated resident lists.

UNITED STATES OF AMERICA
DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 2004-10385-MEL

UNITED STATES OF AMERICA

v.

JEROME WEEKES

EXHIBIT 3 IN SUPPORT OF MOTION FOR NEW TRIAL AND RE-SENTENCING

Counsel's Affidavit Consistent with Footnote 1
from Defendant's Motion for Release Pending
Appeal [Dkt. Entry 75])

UNITED STATES OF AMERICA
DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 2004-10385-MEL

UNITED STATES OF AMERICA

v.

JEROME WEEKES

### AFFIDAVIT OF ATTORNEY THOMAS KERNER

Now comes Thomas Kerner and attests that the representations contained in footnote 1 of the motion for release pending appeal I filed for defendant Jerome Weekes (Dkt. No. 75) are true and accurate to the best of my knowledge and are based on my personal knowledge.  The contents of said footnote 1 are as follows:

The defendant notes that, pending sentencing, Kelvin Brown learned that the defendant was found guilty of possessing the firearm by the jury in this case.  Mr. Brown told the defendant that he was shocked that Mr. Weekes was convicted, given the lack of evidence.  He agreed to speak with defense counsel.

Prior to Mr. Brown speaking with defense counsel, the attorney who represented him in the joint prosecution of the defendant and Brown in the Brockton District Court called defense counsel.  Defense counsel was informed that Mr. Brown was going to speak with defense counsel against the advise of the attorney who represented Mr. Brown in the Brockton prosecution.

When defense counsel met with Mr. Brown he stated what Mr. Weekes claimed he had been told by Brown prior to trial. Defense counsel then asked Mr. Brown if that was accurate and would he speak to the Court and the prosecutor. Mr. Brown asked defense counsel whether he would go to jail if he spoke to the Court and the prosecutor. Defense counsel advised Mr. Brown to speak to a lawyer because there was a potential that anything he said could be used to prosecute him.

Mr. Brown spoke to two lawyers recommended by defense counsel. Both of those lawyers told defense counsel that Mr. Brown would not cooperate further with Mr. Weekes's defense unless Mr. Brown was assured that he would not face criminal prosecution. Mr. Brown refused to retain either attorney to make inquiry with the United States Attorney and the Plymouth County District Attorney to determine whether Mr. Brown would be prosecuted for gun charges.

Sworn to under the pains and penalties of perjury on this 22nd day of February, 2008.

Respectfully Submitted,

J. THOMAS KERNER
MA BBO # 552373
Attorney at Law
343 Commercial St., Unit 104
Boston, MA  02109
(617) 720-5509

2

UNITED STATES OF AMERICA
DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 2004-10385-MEL

UNITED STATES OF AMERICA

V.

JEROME WEEKES

**<u>EXHIBIT 4 IN SUPPORT OF MOTION FOR NEW TRIAL AND RE-SENTENCING</u>**

Affidavit of Attorney Carlos Dominguez

UNITED STATES OF AMERICA
DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 2004-10385-MEL

UNITED STATES OF AMERICA

v.

JEROME WEEKES

<u>AFFIDAVIT OF ATTORNEY CARLOS DOMINGUEZ</u>

Now comes Attorney Carlos Dominguez and attests that in November 2006 I had a privileged conversation with an individual named Kelvin Brown.  I was advised by Attorney Thomas Kerner that Mr. Brown was a potential witness in a case in which Attorney Kerner represented the defendant, Jerome Weekes.  Mr. Brown had told Attorney Kerner that he was concerned whether Mr. Brown's testimony could cause Mr. Brown to face criminal liability.

I spoke to Mr. Brown about the events of October 22, 2004, when he and Jerome Weekes were both arrested by the Brockton Police.  Based on my conversation with Mr. Brown during which he told me what occurred and what he did on October 22, 2004 in Brockton, Massachusetts, the details of which I cannot disclose due to the attorney/client privilege, I advised Mr. Brown that unless he was promised immunity from prosecution his testimony in the Weekes matter could subject him to criminal prosecution.

I offered, for a reasonable fee, to contact the Assistant United States Attorney prosecuting Mr. Weekes and the Plymouth

County District Attorney to inquire whether Mr. Brown would be offered immunity from prosecution if he were to testify truthfully in the Weekes matter. Mr. Brown advised me that he would not hire me.

Sworn to under the pains and penalties of perjury on this 9th day of July, 2007.

CARLOS J. DOMINGUEZ

2

UNITED STATES OF AMERICA
DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 2004-10385-MEL

UNITED STATES OF AMERICA

v.

JEROME WEEKES

**EXHIBIT 5 IN SUPPORT OF MOTION FOR NEW TRIAL AND RE-SENTENCING**

Excerpt from Day 1 Trial Transcript

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )    Criminal Action
                                   )    No. 04-10385-MEL
v.                                 )
                                   )
JEROME WEEKS,                      )
                                   )
          Defendant.               )
                                   )

BEFORE:  MORRIS E. LASKER, Senior District Judge

DAY 1 OF JURY TRIAL

APPEARANCES:

     UNITED STATES ATTORNEY'S OFFICE
     By: Christopher F. Bator, Assistant U.S. Attorney
     John Joseph Moakley Federal Courthouse
     One Courthouse Way
     Boston, Massachusetts  02210
     On Behalf of the Government

     LAW OFFICE OF J. THOMAS KERNER
     By: J. Thomas Kerner, Esq.
     343 Commercial Street - Unit 104
     Boston, Massachusetts  02109
     On Behalf of the Defense

          John J. Moakley United States Courthouse
                    Courtroom No. 8
                   One Courthouse Way
              Boston, Massachusetts  02210
               Monday, September 18, 2006
                        10 a.m.

            Marcia G. Patrisso, RPR, CRR
               Official Court Reporter
           John J. Moakley U.S. Courthouse
           One Courthouse Way, Room 3507
             Boston, Massachusetts  02210
                   (617) 737-8728

     Mechanical Steno - Computer-Aided Transcript

Ex 5

```
 1                        I N D E X

 2
                          Direct   Cross   Redirect   Recross
 3
       WITNESSES FOR THE
 4        GOVERNMENT:

 5     MICHAEL DARRAH
            By Mr. Bator      65                145
 6          By Mr. Kerner:            117

 7     WILLIAM HEALY
            By Mr. Bator     147                167
 8          By Mr. Kerner            157                   167

 9

10                      E X H I B I T S

11     GOVERNMENT'S
       EXHIBIT NO.        DESCRIPTION                   IN EVD.
12
       No. 1A        Photograph                            73
13     No. 1B        Photograph                            77
       No. 1C        Photograph                            78
14     No. 1D        Photograph                            81
       No. 1E        Photograph                            83
15     No. 1F        Photograph                            84
       No. 1G        Photograph                            88
16     No. 1H        Photograph                            89
       No. 1I        Photograph                            91
17     No. 1J        Photograph                           156
       No. 1K        Photograph                            95
18     No. 1L        Photograph                            97
       No. 2A        Shell casing                         117
19     No. 2B        Shell casing                         117

20
       DEFENDANT'S
21     EXHIBIT NO.        DESCRIPTION                   IN EVD.

22     No. 1        Previous Testimony of Officer Healy    163

23

24

25
```

1   apply the law as I instruct you or to be a completely

2   fair and impartial juror in this case?  I think that

3   goes with the question I asked you before, but this is a

4   specific question that the government's asked me to put

5   to you.

6           Is there anybody sitting in the jury box who

7   feels they cannot accept the law?  It appears to be no.

8   All right.  Thank you.

9           I'll question the jurors in the box, and I'd

10  invite counsel to confer with the clerk and inform them

11  of any requests to excuse a juror.

12          (Discussion at sidebar and out of the hearing of

13  the jury:)

14          MR. KERNER:  First off, I'm asking for the whole

15  venire to be discharged because there's not one

16  African-American.

17          THE CLERK:  Your Honor.

18          MR. KERNER:  Sorry, your Honor.  My request is

19  to discharge the whole venire because there's not --

20          THE COURT:  Is to what?

21          MR. KERNER:  Discharge the whole group because

22  there's not one African-American in the whole group.

23          THE COURT:  Your request is denied.  It's the

24  luck of the draw.  I see nothing that suggests

25  purposeful discrimination.  I'll state that looking over

1   the whole array, there seems to be only, perhaps, one

2   dark-skinned person, and there are a few over there.

3   And the panel was drawn, as you know, objectively.

4   Okay.

5           MR. KERNER:  Thank you.

6           MR. BATOR:  Do I go first and then he goes and

7   then -- 2 -- I think, six and ten?

8           THE CLERK:  You get six and you get ten.

9           MR. BATOR:  Yeah.  I move to strike Number 2.

10          THE CLERK:  Number 2.

11          MR. KERNER:  Do we alternate?

12          MR. BATOR:  Yeah.  You get two now.

13          MR. KERNER:  All right.

14          MR. BATOR:  But you can't go back after.

15          MR. KERNER:  Number 7 and 9.

16          MR. BATOR:  Number 8.

17          MR. KERNER:  That's it.

18          THE CLERK:  That's it for now?  All right.

19          (In open court:)

20          THE CLERK:  Juror No. 2, you may go back down to

21   the jury room; Juror No. 7, you may go back to the jury

22   room; Juror No. 8, you may go back to the jury room; and

23   Juror No. 9.

24          THE COURT:  Thank you, ladies and gentlemen.  I

25   hope you get chosen for some other jury.

UNITED STATES OF AMERICA
DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 2004-10385-MEL

UNITED STATES OF AMERICA

v.

JEROME WEEKES

**EXHIBIT 6 IN SUPPORT OF MOTION FOR NEW TRIAL AND RE-SENTENCING**

Excerpt from Day 3 Trial Transcript

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )
                               )
        Plaintiff,             )   Criminal Action
                               )   No. 04-10385-MEL
v.                             )
                               )
JEROME WEEKS,                  )
                               )
        Defendant.             )
                               )

BEFORE:  MORRIS E. LASKER, Senior District Judge

DAY 3 OF JURY TRIAL

APPEARANCES:

        UNITED STATES ATTORNEY'S OFFICE
        By: Christopher F. Bator, Assistant U.S. Attorney
        John Joseph Moakley Federal Courthouse
        One Courthouse Way
        Boston, Massachusetts  02210
        On Behalf of the Government

        LAW OFFICE OF J. THOMAS KERNER
        By: J. Thomas Kerner, Esq.
        343 Commercial Street - Unit 104
        Boston, Massachusetts  02109
        On Behalf of the Defense


                John J. Moakley United States Courthouse
                       Courtroom No. 8
                       One Courthouse Way
                 Boston, Massachusetts  02210
                 Wednesday, September 20, 2006
                        9:15 a.m.

                 Marcia G. Patrisso, RPR, CRR
                    Official Court Reporter
                 John J. Moakley U.S. Courthouse
                 One Courthouse Way, Room 3507
                 Boston, Massachusetts  02210
                        (617) 737-8728

        Mechanical Steno - Computer-Aided Transcript

Ex 6

1
                                I N D E X

2
                        Direct   Cross   Redirect   Recross

3
        WITNESSES FOR THE
4          GOVERNMENT:

5       MICHAEL DARRAH
             By Mr. Bator      63                81
6            By Mr. Kerner            71                    83

7
        WITNESSES FOR THE
8          DEFENSE:

9       JEROME WEEKES
             By Mr. Kerner     15
10           By Mr. Bator            49

11

12

13                              E X H I B I T S

14
        DEFENDANT'S
15      EXHIBIT NO.       DESCRIPTION                ID    IN EVD.

16      No. 2            Jacket                      37      38

17

18

19

20

21

22

23

24

25

1    exhibit should go in or not.

2          MR. KERNER:  Thank you.  One thing I need to

3    bring up is that it is my understanding that Mr. Weekes

4    may be offering testimony that would ordinarily be

5    hearsay, but I think it's admissible as a statement

6    against penal interests.  He informed me that Mr. Brown,

7    Kelvin Brown, the other person who was present, told him

8    that when they were shot at by the people in the SUV,

9    that Mr. Brown picked up the gun and ran with it, and

10   that's how it got over to the Verizon Building.

11         THE COURT:  I'm not going to let that in, no.

12   If you want to call Mr. Brown, call him.

13         MR. KERNER:  But it's a statement against penal

14   interests on the part of Mr. Brown.

15         MR. BATOR:  He's --

16         MR. KERNER:  If --

17         THE COURT:  It would be a statement against

18   penal interest if it was made, but I'm sanctioning your

19   assumption that it was made.

20         MR. KERNER:  Well, Mr. Weekes is claiming that

21   it was made.

22         THE COURT:  I know he's claiming it.  But -- I

23   hear you.  But isn't the witness available?

24         MR. KERNER:  No.

25         THE COURT:  Why not?

1    MR. KERNER: We've tried extensively over the

2    past few months to contact him; we've had no luck

3    whatsoever. The only way he's -- he will testify that

4    the only way he's been able to contact Brown is he ran

5    into Brown when Brown was with another friend at some

6    point in the past, spoke to him briefly about what

7    happened on the night of the incident, asked him if he

8    would go to the police, and Brown said, "No, I'm not

9    getting involved. This is your problem." And from that

10   point on he hasn't had any contact with Brown, and he

11   has no -- he doesn't know Brown that well to begin with.

12   He's tried extensively through an old girlfriend to find

13   him. He does not know where Brown is.

14        MR. BATOR: I'd argue, your Honor, that's

15   insufficient for availability. He's not unavailable

16   until he's been subpoenaed and he comes here and takes

17   the Fifth, and then he's not unavailable -- unwilling to

18   testify or --

19        THE COURT: You'd be agreeable to that testimony

20   under those circumstances?

21        MR. BATOR: Well, I think at least then you've

22   got the threshold where there would be an argument, but

23   I don't think that's --

24        THE COURT: If you're satisfied that I have the

25   authority to exclude the evidence and you want to take a

1   chance before the Court of Appeals on that, I would

2   agree, so I'm ruling against it.

3          MR. KERNER:  Okay.  So I'm not going to ask him

4   what Brown told him?

5          THE COURT:  Right.

6          MR. KERNER:  Okay.

7          THE COURT:  Okay?

8          MR. BATOR:  I would like to know -- there's this

9   one last issue.  Are you going to ask about the

10  photographs?

11         MR. KERNER:  Yes.

12         Your Honor, he's going to testify that during --

13  when he was being booked, he observed Mr. Brown being

14  photographed and he observed what he looked like, and

15  I'm going to introduce the photographs of Brown that

16  were taken by the Brockton police that night.

17         MR. BATOR:  I thought the photos have already

18  been ruled out.

19         THE COURT:  What's the question?

20         MR. KERNER:  Well, he doesn't -- Mr. Bator

21  doesn't think I should be able to introduce these

22  photographs.

23         MR. BATOR:  And I actually don't think that the

24  subject matter is relevant.

25         THE COURT:  What is the relevance?

UNITED STATES OF AMERICA
DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 2004-10385-MEL

UNITED STATES OF AMERICA

v.

JEROME WEEKES

**EXHIBIT 7 IN SUPPORT OF MOTION FOR NEW TRIAL AND RE-SENTENCING**

Sentencing Order in U.S. v. Birkett

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                              )
UNITED STATES OF AMERICA,     )
                              )
          Plaintiff,          )
                              )
          v.                  )   CRIMINAL ACTION
                              )   NO. 06-10139-WGY
KERN BIRKETT,                 )
                              )
          Defendant.          )
                              )
```

SENTENCING MEMORANDUM

YOUNG, D.J.                                    August 21, 2007

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

On May 25, 2006, the United States indicted Kern Birkett ("Birkett") for possession of a firearm and ammunition by a felon in violation of 18 U.S.C. § 922(g)(1).

Birkett initially pled not guilty. Birkett subsequently challenged the incriminating physical and testimonial evidence collected against him through a motion to suppress. The hearing on the motion to suppress commenced on November 27, 2006. At the hearing, Birkett took the stand and was cross-examined by the government. Despite Birkett's testimony, in light of the evidence introduced by the government, this Court denied the motion to suppress.

After the denial of the motion to suppress, Birkett decided to change his plea.  On December 18, 2006, Birkett pled guilty to the charge pursuant to Federal Rule of Criminal Procedure 11.

Following the guilty plea, the Probation Office prepared a Presentence Investigation Report ("PSR").  The Probation Office found that Birkett had two felony convictions for crimes of violence under United States Sentencing Guidelines ("U.S.S.G.") section 2K2.1(a)(2), and calculated the base offense level for the advisory sentencing guidelines at 24.  PSR ¶ 18.  Birkett's criminal history category was calculated as V.  Id. ¶ 38.  These calculations led to an advisory sentencing guideline range of 92 to 115 months.

On May 10, 2007, the Court held a sentencing hearing.  Birkett objected to the PSR's base offense level calculation by challenging the use of a continuation without a finding for a Massachusetts assault and battery charge as a predicate "crime of violence" offense under U.S.S.G. § 2K2.1(a)(2).  In light of this argument, the Court continued the sentencing until July 9, 2007.

## II.  DISCUSSION

### A.  Predicate Offense for a Violent Felony Under U.S.S.G. § 2K2.1

United States Sentencing Guidelines section 2K2.1(a)(2) provides that a defendant who is sentenced for the unlawful possession of a firearm or ammunition ought receive a base offense level of 24 if the defendant already has "at least two felony

2

convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(2). Application Note 1 defines by cross-reference to U.S.S.G. section 4B1.2(a) and Application Note 1 of the Commentary to section 4B1.2, which define a "crime of violence" for sentencing a "career offender" pursuant to section 4B1.1. The definition provided in section 4B1.2 includes offenses specifically enumerated (e.g., aggravated assault and robbery) as well as any offense that "has as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 4B1.2(a)(1) & cmt. n.1 (2006).

The definition for a "crime of violence" provided by section 4B1.2 closely tracks the definition of a "violent felony" for purposes of the Armed Career Criminal Act of 1984 ("ACCA"), Pub. L. 98-473 (Oct. 12, 1984) (codified in scattered sections), that created a mandatory minimum penalty of fifteen years for any person convicted under that statute who had three other applicable predicate offenses. See 18 U.S.C. § 924(e)(1)-(2). Courts alternatively refer to convictions under the category of a "violent felony" as constituting a "crime of violence." See, e.g., United States v. Santos, 363 F.3d 19, 22 (1st Cir. 2004). Due to the similarity of the two provisions, cases pertaining to either provide guidance as to the proper inquiry to apply to an allegedly

3

applicable predicate conviction.[1]  Id. at 22 n.5; United States v. Delgado, 288 F.3d 49, 52 n.5 (1st Cir. 2002).

A "categorical approach" is applied to determine whether an offense satisfies the definition of a "crime of violence."  Taylor v. United States, 495 U.S. 575, 602 (1990).  In Taylor v. United States, the Supreme Court addressed the question of whether a state conviction for burglary constituted a predicate conviction for sentencing enhancement purposes where the state crime of burglary included conduct more inclusive than a generic burglary statute. Id. at 577-79.  The Supreme Court recognized that Congress intended that the sentencing enhancement provisions be triggered by specified elements and not simply by specific crimes so defined in various ways by various state legislatures.  Id. at 588-89. Congress, by designating predicate offenses, had in mind categorical definitions of generic offenses.  Id. at 590.  Where a state statute varies from this generic definition[2] and is more inclusive with regard to punishable conduct, a district court must look only to the statutory definition of the offense and the fact of conviction to determine whether the prior conviction satisfies the definition of a "crime of violence."  Id. at 599-602.

---

[1] One major difference in the relative provisions is that 18 U.S.C. § 924(e)(1) requires three predicate offenses, while U.S. Sentencing Guideline sections 4B1.1(a)(3) and 2K2.1(a)(2) only require two.

[2] Under these circumstances, a state statute is considered "non-generic."

4

This categorical approach prevents a court from considering the particular facts underlying the conviction. Id. at 600. The only exception occurs when the government can show from evidence such as the indictment, information, or jury instructions that a jury necessarily had to find all elements of the generic offense to convict the particular defendant. Id. at 602; see Shepard v. United States, 544 U.S. 13, 20 (2005) (referring to these examples of adequate judicial record evidence as illustrative, not limitative).

The Supreme Court in Taylor also considered the problematic situation where a defendant enters into a plea bargain. See id. at 601-02. The Supreme Court addressed this situation directly in Shepard v. United States, 544 U.S. 13 (2005), where the defendant's prior convictions stemmed from a guilty plea, not a jury verdict. When faced with a guilty plea, the Supreme Court held that the Taylor categorical approach remained the appropriate framework. Id. at 19. The key question is what constitutes an adequate judicial record evidence in this context. Id. at 20-21.

This question presents possible Sixth and Fourteenth Amendment problems if the sentencing district judge is allowed to "make a disputed finding of fact about what the defendant and state judge must have understood as the factual basis of the prior plea." Id. at 25. A sentencing district judge who makes such a disputed factual finding runs afoul of the oft-cited bright line rule of

5

<u>Apprendi</u> v. <u>New Jersey</u>, 530 U.S. 466, 490 (2000), and <u>Jones</u> v. <u>United States</u>, 525 U.S. 227, 243 n.6 (1999), that "any fact other than a prior conviction sufficient to raise the limit of the possible federal sentence must be found by a jury." <u>Shepard</u>, 544 U.S. at 24.  In addition, the sentencing district judge cannot take shelter within the authority recognized by <u>Almendarez-Torres</u> v. <u>United States</u>, 523 U.S. 224 (1998) (a prior conviction is a sentencing factor that need not be proved beyond a reasonable doubt) when the disputed fact is "too far removed from the conclusive significance of a prior judicial record," <u>Shepard</u>, 544 U.S. at 25.

In <u>Shepard</u>, the Supreme Court reversed the First Circuit's holding that complaint applications and police reports may count as "sufficiently reliable evidence for determining whether a defendant's plea of guilty constitutes an admission to a generically violent crime." <u>Id.</u> at 18 (quoting <u>United States</u> v. <u>Shepard</u>, 231 F.3d 56, 67 (1st Cir. 2000)).  In such a case, a sentencing judge's inquiry is "limited to the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." <u>Id.</u> at 26.

In this case, Birkett cites the <u>Taylor</u> and <u>Shepard</u> framework in challenging the Probation Office's base offense level

calculation.   Def. Sentencing Mem. [Doc. No. 18] at 4-9.   The Probation Office suggests that Birkett's prior continuation without a finding for assault and battery, PSR ¶ 30, and conviction for distribution of marijuana, id. ¶ 33, satisfy the predicate offense requirement for a sentencing enhancement under section 2K2.1(a)(2), id. ¶ 18.[3]

The application of the Taylor framework governs whether a prior conviction meets the definition of a "crime of violence" under section 2K2.1.  United States v. Mangos, 134 F.3d 460, 463-64 (1st Cir. 1998); see also United States v. Bell, 445 F.3d 1086, 1089, 1091 (8th Cir. 2006); United States v. Hubbard, 120 Fed. Appx. 49, 50 (9th Cir. 2005) (unpublished opinion).  The question is, therefore, whether Birkett's continuation without a finding[4] under Massachusetts' assault and battery statute, Mass. Gen. Laws ch. 265, § 13A, satisfies the categorical approach required by Taylor and Shepard.

Fitting the Massachusetts assault and battery statute within the federal sentencing scheme has proved to be especially

---

[3] The PSR also lists a continuation without a finding for an Assault & Battery with a Dangerous Weapon.  PSR ¶ 29.  This offense does not count towards the predicate offense requirement, however, because it does not constitute an adult conviction.  See id. (noting that Birkett was seventeen years old); U.S.S.G. § 4B1.2, cmt. n.1 (defining an adult conviction as one generally committed at age eighteen or older).

[4] There is no question that a Massachusetts continuation without a finding constitutes a prior conviction.  See United States v. Fraser, 388 F.3d 371, 373-74 (1st Cir. 2004).

7

problematic.  <u>See</u> <u>Santos</u>, 363 F.3d at 23; <u>United States</u> v. <u>Jones</u>, 235 F.3d 342, 346 (7th Cir. 2000) (applying Massachusetts law); <u>Mangos</u>, 134 F.3d at 463-64; <u>Caggiano</u> v. <u>United States</u>, 977 F.2d 566, 1992 WL 295141, at *2 n.5 (1st. Cir. 1992) (unpublished opinion); <u>United States</u> v. <u>Harris</u>, 964 F.2d 1234, 1236 (1st Cir. 1992) *abrogated on other grounds by* <u>Shepard</u>, 544 U.S. 13; <u>United States</u> v. <u>Bregnard</u>, 951 F.2d 457, 459-60 (1st Cir. 1991); <u>United States</u> v. <u>Sanford</u>, 327 F. Supp. 2d 54, 59 (D. Me. 2004).

Massachusetts statutory law makes assault and battery a criminal offense that is punishable by imprisonment up to two and one-half years.  Mass. Gen. Laws ch. 265, § 13A.  The statute does not, however, define the offense.  <u>See</u> <u>id.</u>  As a result, Massachusetts common law provides the applicable definition.  <u>See</u> <u>Commonwealth</u> v. <u>Burke</u>, 390 Mass. 480, 481-83 (1983).  The common law definition includes two separate crimes.  <u>Id.</u>  The first involves actual or potential physical harm.  <u>Id.</u> at 482-83.  The second involves unharmful, but nonconsensual touching.  <u>Id.</u>  The problematic nature of this statute is that the charging language is boilerplate and fails to distinguish between the two.  <u>Harris</u>, 964 F.2d at 1237.  The proper form of indictment in Massachusetts courts is to charge that the defendant "did assault and beat" the victim, regardless of whether the defendant is charged with the harmful type of battery or the nonconsensual type of assault and

battery.  Mass. Gen. Laws ch. 277, § 79; Jones, 235 F.3d at 347; Harris, 964 F.2d at 1237.

The law in the First Circuit is clear that this boilerplate charging language *does not* preclude a categorical conclusion that a defendant's conviction satisfies the definition of a "crime of violence" despite a bifurcated, non-generic assault and battery statute.  See Santos, 363 F.3d at 24.  In fact, it is clear that where adequate judicial record evidence proves that a defendant's prior conviction is of the harmful battery type under the Massachusetts' assault and battery statute, the predicate offense will constitute a "crime of violence."  See id. at 23 (holding that the harmful battery type of offense satisfied the definition of a "crime of violence" under U.S.S.G. § 4B1.2); Mangos, 134 F.3d at 464 (same).

What is less clear is whether a conviction for a nonconsensual touching offense under Massachusetts General Laws, chapter 265, section 13A constitutes a "crime of violence."  The First Circuit does not recognize that all such nonconsensual touching offenses satisfy that definition.  If it did, the courts would go no further than to rely upon the statutory definition, and they would categorically conclude that a conviction under the non-generic statute constituted a crime of violence.  The Massachusetts statute would, in the Taylor sense, be considered a "generic" statute and

9

would not define assault and battery more broadly than the generic meaning contemplated by Congress.  See Taylor, 495 U.S. at 599.

Instead, the courts consistently apply the Taylor categorical framework, but rely on more than the statutory definition (e.g., the charging documents) to determine whether the particular offense meets the definition of a "crime of violence."  See, e.g., Santos, 363 F.3d at 24 (looking to the charging documents); Mangos, 134 F.3d at 464 (same).  The need to look past the statutory definition implies that at least some offenses under the Massachusetts statute would not meet that definition.

In addition, the crime of assault and battery has been described as encompassing both violent and non-violent conduct. See United States v. Fernandez, 121 F.3d 777, 779 (1st Cir. 1997). A distinction is drawn between offenses that meet the definition of a "crime of violence" and those that are "a mere 'nonconsensual touching.'"  Santos, 363 F.3d at 24.  As a result, the First Circuit has not held that all nonconsensual touching constitutes "violent" contact for purposes of the "crime of violence" determination.  See id.; Fernandez, 121 F.3d at 779.  In fact, where the offensive conduct is truly limited to mere nonconsensual touching, the First Circuit has implied that such an offense would not satisfy the definition of a "crime of violence."  See Santos, 363 F.3d at 24.

Still, the categorical line may not be drawn decisively between violent and non-violent assault and batteries under the

Massachusetts statute.  <u>See id.</u>  The definition of a "crime of violence" will extend to non-violent offenses where the conduct "presents a serious potential risk of physical injury to another." <u>Mangos</u>, 134 F.3d at 464 (quoting U.S.S.G. § 4B1.2).  For example, in <u>United States</u> v. <u>Fernandez</u>, the First Circuit, interpreting the analogous assault and battery on a police officer statute, Mass. Gen. Laws ch. 265, § 13D, held that even a non-violent touching of a police officer satisfies the definition of a "crime of violence" because of its high potential for physical harm.  121 F.3d at 780.

Thus, the issue in this case is whether adequate judicial record evidence exists that Birkett's prior continuation without a finding under Massachusetts General Law, chapter 265, section 13A was for more than a mere nonconsensual touching or one that presented a high potential for physical harm.  In light of <u>Shepard</u>, this Court is "limited to the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information."  544 U.S. at 26.  This presents a markedly different standard than was applied in much of the First Circuit's precedent applying the <u>Taylor</u> framework to the Massachusetts assault and battery statute.

Specifically, <u>Shepard</u>, in vacating the First Circuit decision, as well as explicitly rejecting the First Circuit's approach in

<u>United States</u> v. <u>Harris</u>, 964 F.2d 1234 (1st Cir. 1992), prohibited the use of police reports and complaint applications as support for finding that the predicate conviction satisfied the definition of a "crime of violence." <u>Shepard</u>, 544 U.S. at 19. In reaching that holding, the Supreme Court rejected the use of non-judicial record documents that contain disputed questions of fact. <u>Id.</u> at 25-26. Under this logic, where a defendant disputes facts contained in a PSR, a sentencing district judge likewise is barred from considering the PSR as adequate judicial record evidence for purposes of a sentencing enhancement under U.S.S.G. § 2K2.1. <u>See id.</u> Thus, <u>Shepard</u> severely undermines the First Circuit holdings that look to the PSR to find more than a mere nonconsensual touching, <u>e.g.</u>, <u>Harris</u>, 964 F.2d at 1236-37 (relying on the same to find that the defendant had a knife).

    In this case, the government has not supplied the underlying state indictment or information, the transcript of the plea colloquy, or any other judicially recorded evidence that informs this Court of the defendant's actual offense. The only data in the record before this Court is contained in the PSR. The PSR states that "the criminal complaint alleges the defendant did assault and beat." PSR ¶ 30. As described above, this is boilerplate statutory language and provides no probative evidence of the conduct charged and admitted. The only evidence of charged conduct contained in the PSR comes from police reports. <u>Id.</u> <u>Shepard</u> is

clear that this Court may not look to such reports for evidence that the conviction constitutes a "crime of violence." 544 U.S. at 16. Furthermore, the defendant disputes the facts contained in the PSR. Def. Sentencing Mem. at 8. This eliminates any argument that the facts in the PSR may be deemed admitted. See Bregnard, 951 F.2d at 460 (holding that facts stated in a PRS are deemed admitted if they are not challenged in the district court).

Thus, in order for this Court to find that the underlying state continuation without a finding constitutes a "crime of violence," it would necessitate a finding of fact that considered non-judicial recorded evidence. As a result, this Court cannot conclude that Birkett was charged or eventually pled to any conduct of more import than mere nonconsensual touching. Such a holding is similar to facts faced by the Seventh Circuit in Jones. 235 F.3d at 347-48. It is also distinguishable from other First Circuit precedent that reached the opposite conclusion. See United States v. Estevez, 419 F.3d 77, 82 (1st Cir. 2005) (defendant's assault was "clearly" a "crime of violence"); Mangos, 134 F.3d at 464 (noting evidence of a physical beating); Bregnard, 951 F.2d at 460 (same); Santos, 363 F.3d at 24 (noting that defendant committed the assault and battery with a dangerous weapon); Harris, 964 F.2d at 1237 (same); Sanford, 327 F. Supp. 2d at 59 (same).

For these reasons, the government failed to provide this Court with sufficient adequate judicial record evidence categorically to

13

find that Birkett's 2001 continuation without a finding under the Massachusetts simple assault and battery statute constitutes a "crime of violence." As a result, the proper calculation of Birkett's base offense level for the advisory sentencing guidelines under U.S.S.G. § 2K2.1 is 20 pursuant to subsection (a)(4) rather than 24 pursuant to subsection (a)(2).

## B. Statistics

The United States sentencing guideline ranges are only advisory. United States v. Booker, 543 U.S. 220, 245 (2005). They must, however, be calculated, considered, and given substantial weight when fashioning an individualized sentence. See United States v. Jimenez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc). One way that this Court seeks to determine what weight to give the advisory guidelines in the circumstances of a particular case is to compare the advisory range to all available sentencing statistics. See United States v. Griffin, -- F. Supp. 2d --, 2007 WL 1620526, at *3 (D. Mass. June 6, 2007). This involves gathering data on the nationwide, First Circuit, and District of Massachusetts average sentences for the instant offense. Id. It also entails considering the average sentence imposed in this Session, which is independently collected and managed by this Session's court reporter, Donald Womack. Id. at *3 & n.18.

In this case, the Probation Office provided the following statistics for Birkett's felon in possession of a firearm and

14

ammunition offense.   The nationwide average was 82 months (data obtained from the United States Sentencing Commission).   The average in the First Circuit was 93 months (data obtained from the United States Sentencing Commission) and the average for the District of Massachusetts was 107 months (data obtained from the Probation Office's internal database).   The average sentence in this Session was 99 months (data obtained from the publicly available database maintained by court reporter Donald Womack). Transcript of Sentencing Hearing, July 9, 2007 [Doc. No. 24] ("Tr.") at 3:25-4:7.

Birkett raised a considered objection to the use of these statistics.   Specifically, he argued that the averages were skewed toward a greater penalty because neither the Sentencing Commission nor the Probation Office separates out the ACCA offenses with their mandatory minimum sentences from the unenhanced sentences for a simple conviction.   The Probation Officer confirmed that neither the Sentencing Commission nor this district's Probation Office database separates those offenses driven by the ACCA from the cognate offenses not so affected. Tr. at 11:1-13:18.   The averages provided thus cannot be given any persuasive weight until this error is corrected.   As a result, this Court did not consider them in determining the weight to be given to the advisory sentencing guidelines or in fashioning Birkett's sentence.

15

In contrast, the publicly available data maintained independently in this Session accurately reflects this difference. Thus, this Session's average of 99 months was considered and weighed when considering the weight to give the advisory sentencing guidelines. It was of minimal help here, however, in the absence of the larger databases, since a single session hardly has enough samples to provide for statistically significant data.

### C.    The Statutory Maximum After _Rita_ v. _United States_

In _United States_ v. _Griffin_, this Court tackled the enduring problem of reconciling a defendant's Sixth Amendment rights with the advisory sentencing guideline regime after _United States_ v. _Booker_. _See_ 2007 WL 1620526, at *10-*14. This Court determined that controlling authority and the practical workings of an appellate review based on reasonableness required that the statutory maximum for Sixth Amendment purposes could neither be the minimum sentence provided nor the maximum penalty allowed by the applicable statute. _Id._ Instead, the statutory maximum would be determined by a judge from the facts either proved to a jury or admitted by the defendant through his or her plea. _See id._ at *13-*14. Such a determination would be influenced by the advisory guideline calculations and an ever-developing body of common law sculpted by appellate review.

Soon after _Griffin_, the Supreme Court reached a decision in the sentencing case _Rita_ v. _United States_, -- U.S. --, 127 S. Ct.

16

2456 (2007).   The Supreme Court in <u>Rita</u> addressed the narrow question of "whether the law permits the courts of appeals to use [a] presumption" of reasonableness for sentences imposed by district courts within a properly calculated advisory guidelines range.  <u>Id.</u> at 2459.  The Supreme Court answered that limited issue in the affirmative, and it went on to state that the presumption of reasonableness is an appellate presumption only and reflects appellate deference to a sentencing judge's discretion combined with Congress's policy choices and objectives as expressed through the 18 U.S.C. § 3553(a) factors.  <u>Id.</u> at 2463

The Supreme Court considered whether an appellate presumption of reasonableness for a within guidelines range sentence would affect a defendant's Sixth Amendment rights.  The Supreme Court answered in the negative.  <u>Id.</u> at 2465-66.  It did so by stating that the Sixth Amendment is violated when a sentencing regime requires a judge to impose a sentence higher than jury-determined facts standing alone.  <u>See</u> <u>id.</u>  A nonbinding appellate presumption of reasonableness *does not require* a sentencing judge to go above the statutory maximum as determined by the jury-determined facts. <u>See</u> <u>id.</u>  In addition, such a presumption does not forbid a sentencing judge from going above the advisory guidelines where the

jury-determined facts provide for a statutory maximum that exceeds a properly determined advisory guideline range.  See id.[5]

The holding in Rita avoids a Sixth Amendment infirmity by confining the presumption of reasonableness to the appellate courts.  Were the presumption of reasonableness binding on the district courts, that would render the guidelines de jure mandatory and supplant the focus on jury-determined facts for the assessment of the statutory maximum.  While the Supreme Court recognized that the effect of its holding might  be that a judge and not a jury would be more likely to find "sentencing facts," it simply stated, as this Court held in Griffin, 2007 WL 1620526, at *13 & n.40, that the Sixth Amendment does not forbid judicial factfinding for sentencing purposes, Rita, 127 S. Ct. at 2465; see also McMillan v. Pennsylvania, 477 U.S. 79, 93 (1986).  Those "sentencing facts" nevertheless must not raise the statutory maximum as determined by the jury verdict or plea.  See Griffin, 2007 WL 1620526, at *13 & n.40.

In light of the Rita holding and cognizant that two justices, in a concurring opinion in Rita, explicitly ratified and endorsed this Court's practice in Griffin, this Court continues to be bound to determine the statutory maximum for the purpose of Birkett's

_____

[5] As is described below, such a situation occurred in this case.

sentencing.    See Rita, 127 S. Ct. at 2480 n.5 (Scalia, J.,
concurring).

In accordance with this procedure, this Court determined the
statutory maximum sentence to be 78 months.  Tr. at 3:20-21.  The
Court determined this statutory ceiling by providing dispositive
weight to the advisory sentencing guideline range for assault and
battery under 2K2.1, calculated based on the facts alleged in the
indictment and to which Birkett pled guilty and before any downward
adjustment for acceptance of responsibility.  Tr. at 2:20-3:21.

### D.  Birkett's Sentence

Once the statutory maximum was determined, this Court
calculated the advisory guideline range.  Tr. at 5:2-7.  Due to the
Court's ruling rejecting the 2K2.1(a)(2) enhancement, Birkett's
criminal history category, and the three level base offense level
reduction for acceptance of responsibility, the advisory range was
calculated at 46 to 57 months.  Tr. at 5:2-7.

This advisory guideline range was significantly below this
Session's applicable average sentence of 99 months for this
offense.  See Tr. at 4:5-7; 7:6-13.  In addition, this Court
considered judicially found facts that, while not piercing the 78
month statutory maximum, were considered both as to the weight to
give the calculated advisory guideline range and in this Court's
independent consideration of the 18 U.S.C. § 3553(a) factors.
Included in this consideration was Birkett's extensive criminal

history, specifically his continuation without a finding for assault and battery with a dangerous weapon that he committed while seventeen, PSR ¶ 29, and the continuation without a finding for assault and battery that was not considered, largely and properly based on a technicality, a "crime of violence" for guideline enhancement purposes under section 2K2.1(a)(2), see id. ¶ 30.[6]

_____

[6] This is precisely the approach adopted by Judge Saylor in imposing an above-guideline sentence in United States v. Marsh, 486 F. Supp. 2d 150, 159 (D. Mass. 2007). There, Judge Saylor cogently observes:

> Vacating state court convictions for strategic purposes, particularly to avoid federal sentencing consequences, has lately become commonplace, if not routine. See Julie Austin, Note, Closing a Resentencing Loophole: A Proposal to Amend 28 U.S.C. § 2255, 79 S. Cal. L.Rev. 909 (2006) (discussing problem in context of habeas corpus proceedings, and noting that Massachusetts convictions are "particularly vulnerable" to challenge). Under the hydraulic pressures of lengthy prospective sentences in the federal system, the impulse by defendants to vacate prior convictions is entirely understandable.

> Yet the process is nonetheless deeply troubling. A felony conviction is, and ought to be, a profoundly significant event. Its importance goes well beyond its immediate consequences, such as punishment; sentencing decisions in every jurisdiction in the United States are driven in great measure by the criminal history of the defendant. Felony convictions should neither be imposed nor overturned lightly, and under no circumstances should they be treated like a Las Vegas marriage, to be annulled when they become burdensome or inconvenient.

> Vacating long-standing convictions for strategic purposes also serves to erode public confidence in the criminal justice system. If the process is perceived to be readily manipulable, or even dishonest, the damage to that confidence is likely to be substantial indeed.

The Court also considered Birkett's "acceptance of responsibility." Tr. at 20:7-17.[7] Specifically, this Court considered Birkett's willingness to testify at the motion to suppress and, after losing that motion, his willingness to spare the government the need and expense of a trial. See id. A defendant is generally given a three-level reduction in his or her base offense level as a discount for sparing the government the burden and expense of a trial. In this case, under a criminal history category V and an after-reduction base offense level of 17, Congress recommends reducing the sentence by between six and 32 months.[8]

In light of the dangerous, gang-related nature of this offense and the long criminal history, this Court concluded that the advisory guideline range, calculated at 46 to 57 months, did not adequately address Birkett's offense. Instead, this Court concluded that a sentence up to the statutory maximum of 78 months

---

Id. This Court emphatically agrees.

[7] The phrase "acceptance of responsibility" is a particularly offensive sophistry that the Sentencing Guidelines have introduced into the common sentencing parlance. This sentencing discount has little or nothing to do with actual remorse and everything to do with the Department of Justice budget. See United States v. Green, 346 F. Supp. 2d 259, 270-71 (D. Mass. 2004), vacated in part on other grounds by United States v. Yeje-Cabrera, 430 F.3d 1 (1st Cir. 2005).

[8] These calculations are derived from comparing the maximum and minimum ranges of base offense level 20 with the same of base offense level 17 under a criminal history category V.

21

was appropriate, just, and warranted. This Court, however, similarly concluded that Birkett ought get a discount for sparing the government a trial. Tr. at 20:13-19. In sum, a reduction of 9 months is in line with Congress's intent and policy judgments as reflected in the advisory sentencing guidelines and properly reflects Birkett's actions in this case.

Thus, Birkett received a 69 month sentence.

This case presents not a departure from the advisory sentencing range but a more faithful adherence to the actual guideline range that Congress would have applied given the relevant conduct in this case.[9]

---

[9] Now that the Sentencing Guidelines are merely advisory, Booker, 543 U.S. at 245, this Court has not hesitated to sentence below the Guidelines wherever appropriate. Indeed, since Booker, 54.4% of the sentences imposed by this Court have been below-Guidelines sentences. For a detailed explication of the grounds for each of the individualized sentences, see the sentencing transcripts -- upon which the Sentencing Commission never looks -- and judgment and commitment orders in United States v. Sosa, Crim. A. No. 05-10315-WGY (D. Mass. Mar. 19, 2007); United States v. Marinez, Crim. A. No. 05-10315-WGY (D. Mass. Mar. 19, 2007); United States v. O'Brien, Crim. A. No. 03-10120-WGY (D. Mass. Feb. 28, 2007); United States v. Reed, Crim. A. No. 03-10399-WGY (D. Mass. Feb. 8, 2007); United States v. Pierre, Crim. A. No. 05-10265-WGY (D. Mass. Jan. 30, 2007) (appeal pending); United States v. Griffin, Crim. A. No. 05-10175-WGY (D. Mass. Jan. 16, 2007) (D. Mass. Jan. 16, 2007), sentence vacated, Griffin, 2007 WL 1620526; United States v. Girouard, Crim. A. No. 05-10342-WGY (D. Mass. Jan. 11, 2007) (appeal pending); United States v. Soto, Crim. A. No. 05-10321-WGY (D. Mass. Jan. 4, 2007) (appeal pending); United States v. Pierre, Crim. A. No. 05-10265-WGY (D. Mass. Dec. 13, 2006); United States v. Worrell, Crim. A. No. 03-10382-WGY (D. Mass. Dec. 11, 2006); United States v. Riggs, Crim. A. No. 05-10082-WGY (D. Mass. Oct. 16, 2006); United States v. Figueroa, Crim. A. No. 04-10098-WGY (D. Mass. Jul. 12, 2006); United States v. Manning, Crim. A. No. 03-10031-WGY (D. Mass.

Jun. 2, 2006); United States v. Pavao, Crim. A. No. 04-10098-WGY (D. Mass. May 1, 2006); United States v. Arco, Crim. A. No. 04-10372-WGY (D. Mass. Apr. 30, 2006); United States v. Montero, Crim. A. No. 05-10238-WGY (D. Mass. Apr. 5, 2006); United States v. Siciliano, Crim. A. No. 04-10372-WGY (D. Mass. Apr. 4, 2006); United States v. Alves, Crim. A. No. 04-10098-WGY (D. Mass. Mar. 29, 2006), aff'd, No. 06-1822 (1st Cir. May 17, 2007); United States v. Custer, Crim. A. No. 04-10098-WGY (D. Mass. Mar. 28, 2006), aff'd, No. 06-1823 (1st Cir. Feb. 2, 2007); United States v. Dominguez, Crim. A. No. 04-10160-WGY (D. Mass. Feb. 28, 2006); United States v. Rosario, Crim. A. No. 04-10160-WGY (D. Mass. Feb. 23, 2006); United States v. Day, Crim. A. No. 05-10229-WGY (D. Mass. Feb. 8, 2006); United States v. Mahana, Crim. A. No. 05-10269-WGY (D. Mass. Feb. 2, 2006); United States v. Stewart, Crim. A. No. 05-10062-WGY (D. Mass. Jan. 5, 2006); United States v. Frias-Ortega, Crim. A. No. 05-10117-WGY (D. Mass. Dec. 13, 2005), aff'd, No. 06-1156 (1st Cir. Sept. 12, 2006); United States v. Bleidt, Crim. A. No. 05-10144-WGY (D. Mass. Dec. 5, 2005); United States v. Fuller, Crim. A. No. 05-10082-WGY (D. Mass. Nov. 16, 2005); United States v. Villa, Crim. A. No. 04-10160-WGY (D. Mass. Oct. 13, 2005); United States v. Navarro, Crim. A. No. 04-10319-WGY (D. Mass. Oct. 6, 2005); United States v. Mercedes, Crim. A. No. 04-10319-WGY (D. Mass. Oct. 6, 2005); United States v. Zhaoxin, Crim. A. No. 04-10156-WGY (D. Mass. Sept. 28, 2005); United States v. Montero, Crim. A. No. 03-10349-WGY (D. Mass. Sept. 12, 2005); United States v. Miranda, Crim. A. No. 04-10160-WGY (D. Mass. Sept. 12, 2005); United States v. Guerra, Crim. A. No. 03-10349-WGY (D. Mass. Sept. 12, 2005); United States v. Ramos, Crim. A. No. 04-10146-WGY (D. Mass. Jul. 25, 2005); United States v. Teague, Crim. A. No. 03-10362-WGY (D. Mass. May 12, 2005), aff'd, No. 05-1789 (1st Cir. Nov. 29, 2006); United States v. Lino, Crim. A. No. 03-10377 (D. Mass. Apr. 25, 2005), aff'd, -- F.3d --, 2007 WL 2004510 (1st Cir. Jul. 12, 2007); United States v. Montano, Crim. A. No. 00-10073-WGY (D. Mass. Apr. 12, 2005); United States v. McCreadie, Crim. A. No. 04-10338-WGY (D. Mass. Apr. 12, 2005); United States v. Langevin, Crim. A. No. 04-10302-WGY (D. Mass. Apr. 12, 2005); United States v. Pleitez-Martinez, Crim. A. No. 04-10131-WGY (D. Mass. Mar. 8, 2005), aff'd, No. 05-1501 (1st Cir. Nov. 9, 2005); United States v. Dicicco, Crim. A. No. 04-10005-WGY (D. Mass. Feb. 3, 2005); United States v. Brown, Crim. A. No. 04-10225-WGY (Jan. 31, 2005).  It is worthy of note that the government has appealed only two of these sentences.  A sentence above the properly calculated guideline range that does not exceed the defendant's admissions or jury fact-finding ought be equally plausible (albeit rarely imposed).  This decision and the Court's sentence

This sentence protects Birkett's Sixth Amendment rights by identifying the statutory limit that may be imposed given the facts to which he pled guilty. Once this was established, the Court was not required to turn a blind eye to relevant conduct that informed the Court as to where the sentence ought fall below that statutory maximum. In so doing, the Court considered the guidance provided by the Sentencing Commission substantively as it applied to this case and these facts, which included facts of a prior conviction that, while impermissible to raise the statutory maximum, would require a sentence more severe than the "properly" calculated advisory guidelines. To do otherwise would exemplify the fear that sentencing judges will now apply the advisory guidelines mechanically, thus reducing the sentencing judge's role to that of a arithmetician. This is a fear that is only furthered by the Supreme Court's decision in Rita, which now encourages and insulates a within-guideline sentence.

/s/ William G. Young

WILLIAM G. YOUNG
DISTRICT JUDGE

in United States v. Andrade, Crim. A. No. 06-10140-WGY (D. Mass. Jul. 19, 2007) (unpublished opinion) are the only instances in this Session of such sentences. It would be unfortunate indeed if the record keeping of the Sentencing Commission (which nowhere indicates the degree of upward or downward departures or variances from the Guidelines) were to be used to argue that district judges are imposing sentences above the defendant's admissions or jury driven fact-finding. There is, in fact, no evidence to support such a conclusion.

24