UNITED STATES OF AMERICA
DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 2004-10385-MEL

UNITED STATES OF AMERICA

V.

JEROME WEEKES

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL**

Now comes the defendant and files this supplemental motion in support of his motion for a new trial.

The government in its written response and oral argument opposing the motion for a new trial claims that the defendant has failed to demonstrate that Weekes has demonstrated that Kelvin Brown would testify that he picked up the gun used by an individual in a dark SUV to shoot at Weekes and Brown in the Brockton City Hall Annex parking lot and ran with it to the Verizon building parking lot. The government argued that the motion for a new trial should be denied for, among other reasons, Mr. Weekes' contention that Brown made an admission that he possessed the gun was uncorroborated.

The government wrote in its opposition:

> There is also not a **shred** of evidence beyond Weekes' unsworn, self-serving statement that Brown ever said or would testify that he picked up the gun and carried it to the fence. Other than Weekes' mere assertion, any suggestion about what Brown purportedly told Weekes long before trial, or told his own counsel in November 2006, after the trial, is pure speculation. See Exhibit 4 to Weekes' motion. That Brown's lawyer advised him in November, 2006 (<u>after the trial</u>) that

"unless he was promised immunity from prosecution his testimony in the Weekes matter could subject him to criminal prosecution" does not establish that [Brown] picked up and carried the gun or that he told Weekes that he did. There are countless other things Brown might have told his counsel that would have prompted reasonable counsel to advise him not to testify without immunity ... Gov. Opp. to Mot. for New Trial, pp. 9-10 (**emphasis in original**).

Admittedly, it is difficult for Weekes to corroborate an admission made privately by Brown to Weekes. But Weekes can point to the fact that at least in October 2004, there was probable cause to believe that Brown possessed the firearm. Brown was charged with possessing the gun in the Brockton District Court.

More importantly, it is not incumbent upon Weekes to demonstrate what Brown's testify would be if Brown elected to testify. In order for Weekes to tell the jury that Brown made a criminal admission to him he need only demonstrate that Brown was not available. United States v. Mann, 590 F.2d 361 (1st Cir. 1978). It is Weekes' contention that his attorney's proffer in chambers, Ex. 6, was sufficient to demonstrate that Brown was unavailable.

Assuming the proffer was not sufficient,[1] the newly obtained

---

[1] If the proffer was not sufficient then this Court must determine whether trial counsel was ineffective for not sending a subpoena to Brown's last and usual address, an address at which Brown was not residing at the time of Weekes' trial. Further, the Court must determine whether counsel was ineffective for not expending funds to hire a

evidence -- the Dominguez Affidavit (Ex. 4) -- corroborates the proffer that Brown was unavailable.  Simply stated, Brown is unavailable, was unavailable and will continue to be unavailable until he is granted immunity from prosecution.  Mr. Weekes did all he could to obtain Brown's testimony at trial.  Brown told Weekes that the gun charge was [Weekes'] problem and Brown would

---

private investigator to locate Brown even though counsel knew from his own investigation that Brown was avoiding all attempts on the part of Weekes and his attorney to contact Brown for purposes of obtaining his trial testimony.  Weekes and/or his attorney tried to contact Brown through Brown's mother, a woman with whom Brown had a boyfriend/girlfriend relationship and Weekes' friends and acquaintances who also knew Brown.

If the Court determines that counsel's efforts to produce Brown for Weekes' trial was insufficient to establish that Brown was unavailable, then Weekes is entitled to a new trial because his attorney was ineffective.  Strickland v. Washington, 466 U.S. 668, 687-96, 104 S.Ct. 2052, 2064-69, 80 L.Ed.2d 674 (1984) (to be entitled to relief on a claim of ineffective assistance of trial counsel, the convicted defendant must show both that counsel's acts were "outside the wide range of professionally competent assistance" and that he was prejudiced by them, in other words, that "counsel's errors were so serious as to deprive the defendant of a fair trial").  Undoubtedly, if the jury, which took several days to reach a verdict, had heard Brown's admission, Weekes' may not have been convicted.

As stated in counsel's accompanying affidavit, counsel believed that his numerous failed attempts, with the assistance of the defendant, to locate and speak with Brown from the time that Weekes advised counsel of Brown's admission were sufficient to establish that Brown was not available for trial.  Further, at the time that counsel filed a motion *in limine*, several weeks prior to trial, counsel advised the government what Weekes' claimed Brown had admitted and that defense counsel had been unable to speak directly with Brown.  (See Ex. 3, pp. 1-3)

not talk to law enforcement or the Court. Weekes did not have an address to serve a subpoena to Brown testify at trial. What the Dominguez affidavit demonstrates is that even if Weekes had been able to obtain Brown's physical presence in Court for his trial, Brown's testimony was unavailable.

After news of Weekes' conviction reached Brown, Brown initiated contact with Weekes and tentatively agreed to speak with Weekes's attorney. Once Brown was advised that his statements concerning the October 22-23, 2004 incident could still subject him to criminal liability, he reiterated his refusal to speak to law enforcement or the Court without a grant of immunity. He remains unavailable.

The defendant makes two other observations:

The government has continuously misstated the evidence regarding Weekes' trial testimony. In his written opposition and during oral argument, the government attorney argued that Weekes' story regarding Brown is incredible. The prosecutor claimed that Weekes testified that he and Brown ran towards the dark SUV from which a person was shooting at them. "[A]ccording to Weekes's story, at the time the shots were fired, Weeks [sic] ran towards the car from which the shots were fired." (Gov. Opp., p. 12) The prosecutor made similar comments during oral argument.

In fact, at pages 27 through 31 of the Day 3 Trial

transcript (Ex. 9), it is clear that Weekes stated the he and Brown were shot at by a rear passenger in the SUV. (Day 3 Transcript, pp. 28-29)  When the shooting started Weekes and Brown dove for cover. (p. 29)  After the shooting stopped, the SUV peeled off and exited the rear of the parking lot. (pp. 29-31) Once the SUV went out the back exit of the annex parking lot, Weekes, followed by Brown, ran towards Crescent Street, which was in the opposite direction the SUV was traveling. (p. 31)

Second, the government claimed that it is only interested in the truth as it relates to who possessed the firearm on October 22-23, 2004.  The government's claim to only wanting the truth would ring much clearer if it were to simply contact Brown and offer him immunity in return for his truthful testimony. Until the government agrees to do for Weekes what it routinely does for itself, the government's stated desire for the truth cannot be taken seriously.

**Conclusion:**

Regardless, whether because of the newly obtained evidence or because of trial counsel's ineffective assistance, Weekes is entitled to a new trial, at which he should be permitted to tell the jury of Brown's criminal admission.

          **Respectfully Submitted,**
          **JEROME WEEKES,**

          **By his attorney:**

          _____
          **J. THOMAS KERNER**
          **MA BBO # 552373**
          **343 Commercial St. Unit 104**
          **Boston, MA  02109**
          **(617) 720-5509**

UNITED STATES OF AMERICA
DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 2004-10385-MEL

UNITED STATES OF AMERICA

V.

JEROME WEEKES

### AFFIDAVIT OF ATTORNEY J. THOMAS KERNER

Now comes Thomas Kerner and attests to the following: I was the trial attorney for defendant Jerome Weekes. The defendant was confined from the date of his Brockton District Court arraignment, October 25, 2004, until May 6, 2005. From May 6, 2005 up to the date of trial, Mr. Weekes made an exhaustive effort to locate Mr. Brown and to secure his presence at trial.

Mr. Weekes told me that on one occasion, well prior to trial, he spoke to Mr. Brown. On that occasion Mr. Weekes saw and spoke briefly with Mr. Brown when Mr. Weekes observed Mr. Brown to be in the company of a mutual friend. It was during that single occasion that Mr. Brown told Mr. Weekes that Brown had picked up the gun which had been dropped or thrown from the car in which the person who discharged the gun was a passenger. Mr. Brown carried the gun from the City Hall Annex parking lot to the Verizon parking lot, where he discarded the gun.

Mr. Weekes told me that he asked Mr. Brown to tell law enforcement. Mr. Brown not only refused to talk to law

Ex. 8

enforcement, he refused to talk to Mr. Weekes further about the incident. Mr. Weekes told me what Brown told him. I told the prosecutor what Weekes claimed Brown told him. Mr. Brown was the subject of a defense motion *in limine*.

Mr. Weekes' and my efforts to determine where Mr. Brown resided consisted of inquiring with Mr. Brown's mother, a girl Mr. Brown used to date and other persons who knew Mr. Brown. Mr. Brown was not residing at the address he gave to the Brockton District Court when he was charged with possessing the same gun which the government claims was possessed by Mr. Weekes. Mr. Weekes, who knew Brown's mother, told me that on numerous occasions she told Mr. Weekes that she did not know where Mr. Brown was residing but that she would tell Mr. Brown to contact Mr. Weekes. By May 2005, the above referenced girl had long lost contact with Mr. Brown. Mr. Brown's acquaintances either couldn't or wouldn't help Mr. Weekes find Mr. Brown.

Mr. Weekes and I made an exhaustive and good faith effort to obtain Mr. Brown's presence for trial even though we had no expectation that Mr. Brown would do anything other than exercise his 5th Amendment right not to incriminate himself. I could not subpoena Mr. Brown because I did not know of an address where I could serve a subpoena. I believed that Mr. Brown was unavailable. I believed that Mr. Brown's statement to Mr. Weekes was admissible pursuant to F.R.Evid. 804(b)(3).

Sworn to under the pains and penalties of perjury on this 15th day of May, 2008.

_____
J. THOMAS KERNER
MA BBO # 552373
Attorney at Law
343 Commercial St., Unit 104
Boston, MA  02109
(617) 720-5509

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )   Criminal Action
                                )   No. 04-10385-MEL
v.                              )
                                )
JEROME WEEKS,                   )
                                )
        Defendant.              )
                                )

BEFORE:  MORRIS E. LASKER, Senior District Judge

DAY 3 OF JURY TRIAL

APPEARANCES:

   UNITED STATES ATTORNEY'S OFFICE
   By: Christopher F. Bator, Assistant U.S. Attorney
   John Joseph Moakley Federal Courthouse
   One Courthouse Way
   Boston, Massachusetts  02210
   On Behalf of the Government

   LAW OFFICE OF J. THOMAS KERNER
   By: J. Thomas Kerner, Esq.
   343 Commercial Street - Unit 104
   Boston, Massachusetts  02109
   On Behalf of the Defense


         John J. Moakley United States Courthouse
                    Courtroom No. 8
                   One Courthouse Way
             Boston, Massachusetts  02210
            Wednesday, September 20, 2006
                      9:15 a.m.

             Marcia G. Patrisso, RPR, CRR
                Official Court Reporter
           John J. Moakley U.S. Courthouse
           One Courthouse Way, Room 3507
             Boston, Massachusetts  02210
                  (617) 737-8728

Mechanical St                    -Aided Transcript

Ex. 9

# I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **WITNESSES FOR THE GOVERNMENT:** | | | | |
| MICHAEL DARRAH | | | | |
|     By Mr. Bator | 63 | | 81 | |
|     By Mr. Kerner | | 71 | | 83 |
| **WITNESSES FOR THE DEFENSE:** | | | | |
| JEROME WEEKES | | | | |
|     By Mr. Kerner | 15 | | | |
|     By Mr. Bator | | 49 | | |

# E X H I B I T S

| DEFENDANT'S EXHIBIT NO. | DESCRIPTION | ID | IN EVD. |
|---|---|---|---|
| No. 2 | Jacket | 37 | 38 |

1  Q.   I'm showing you Exhibit No. 1C.  Can you point out
2  to the jury, if it's possible on that exhibit, where you
3  and Kelvin cut through from the Joe Angelo's parking lot
4  to the City Hall Annex parking lot?
5  A.   Well, we walked down here; we cut through this
6  little split in the fence towards the annex, the back of
7  the annex building.
8          MR. KERNER:  I lost my notes.  One second,
9  please, your Honor.
10 BY MR. KERNER:
11 Q.   After you went through the split in that fence --
12 and if you could stand back a little bit so that
13 everybody, including I, can see that exhibit.  What did
14 you do when you got into the City Hall Annex parking lot?
15 A.   Well, when we got through the split in the fence, we
16 started walking towards Crescent Street towards our car.
17 Q.   Now, can you point on the overhead picture, Exhibit
18 1, where you were walking?
19 A.   We was going down here, down towards Crescent Street.
20 Q.   And that would be in a northerly direction?
21 A.   Correct.
22 Q.   Sir, what happened when you were walking up that
23 parking lot driveway?
24 A.   Well, that's when an SUV started coming down.
25 Q.   You saw -- where did you see an SUV, sir?

1  A.  Well, when I seen it, it just turned off of Crescent
2  Street coming down the annex parking lot, I think it is.
3  Q.  Okay. So the record will reflect that you just
4  pointed to the fact that the SUV turned south off of
5  Crescent Street into the City Hall Annex parking lot; is
6  that correct?
7  A.  Correct.
8  Q.  And then what happened after you saw that SUV turn
9  into that parking lot?
10 A.  Well, at that point someone in the front passenger
11 side said, "There they go."
12 Q.  You heard someone say, "There they go"?
13 A.  Yeah.
14 Q.  And then what happened after you heard someone say,
15 "There they go"?
16 A.  That's when the back window rolled down of the rear
17 passenger.
18 Q.  What did the rear passenger do?
19 A.  Well, that's when he pointed a gun out the window
20 and started shooting at us.
21 Q.  So a person in the rear passenger seat put his hand
22 out the window?
23 A.  Yes.
24      MR. BATOR:  Objection, your Honor. I'd ask that
25 the -- direct not be leading questions.

1           THE COURT: I think he was just clarifying the
2  previous answer.
3           Don't lead.
4           MR. KERNER: Thank you, your Honor.
5  BY MR. KERNER:
6  Q.  And what did he do from the rear passenger's seat?
7  A.  He pointed a gun out the window and started shooting
8  at us.
9  Q.  What did you do, sir, when he started shooting at
10 you?
11 A.  I dove for cover behind -- there were cars parked on
12 the side of the building, so I dove for cover behind the
13 cars.
14 Q.  Do you know what Kelvin did?
15 A.  I think he dove, too.
16 Q.  Do you know what the SUV did --
17 A.  After that --
18 Q.  -- after they started shooting at you?
19 A.  Yeah, they just peeled off and drove -- coming down
20 the annex parking lot, I guess -- I don't know. There's
21 only one way out, so I guess they went this way. I'm
22 not sure what they did.
23          THE COURT: Was that the last time you saw them?
24          THE WITNESS: Yeah, the last time I saw them.
25          THE COURT: Do you know who it was?

```
 1         THE WITNESS:  I never seen them in my life.
 2   BY MR. KERNER:
 3   Q.   Now, sir, where were you standing -- one second.
 4        Either with this picture, sir, which is Exhibit No.
 5   1D, or Exhibit 1E, can you point to the jury where you
 6   were approximately when you were shot at by people in
 7   the SUV?
 8   A.   Right over there.
 9   Q.   On which side of the fence, sir, if this is Joe
10   Angelo's?
11   A.   I was on the opposite side, right here.
12   Q.   So you were on the opposite side.
13        You have to stand back so the jury can see.
14        You were on the opposite side of this fence, which
15   is the City Hall Annex?
16   A.   Yeah.
17   Q.   And about where in relation to this fence were you
18   standing when they started shooting at you?
19   A.   At that point I was walking down towards -- probably
20   right around here.
21   Q.   So just after the beginning of the green fence?
22   A.   Yes.
23   Q.   What did you do, sir, after the -- you can return to
24   the stand now.
25   A.   (Witness complies.)
```

1  Q. What did you do after the SUV went down the parking
2  lot and went out the back?  What did you and Kelvin do?
3  A. I ran toward Crescent Street.
4  Q. Okay.  And did you see what Kelvin did?
5  A. I assumed that he ran, too.  I'm not sure.
6  Q. Okay.  Were you in front of him or behind him?
7  A. I was in front of him.
8  Q. What happened when you got to Crescent Street?
9  A. That's when I took a right going towards Maple Ave.,
10 and I think that's when Officer -- I seen Officer Darrah.
11 Q. You saw Officer Darrah when you got to Crescent
12 Street?
13 A. Yeah.
14 Q. What, if anything, did Officer Darrah say or do when
15 you saw him?
16 A. He said, "Stop or I'll shoot you."
17 Q. He said that to you?
18 A. Yes.
19 Q. And what did you do, sir?
20 A. I kept running.
21 Q. Once you got to Maple Ave., sir, what did you do?
22 A. I ran to the back of the Verizon parking lot.
23 Q. So you ran down Maple Ave. in a southerly direction?
24 A. Yeah.
25 Q. And where did you run to, sir?